J^WHIPPLE, J.
The defendant, Calvin R. Pitre, was charged by grand jury indictment with first degree murder. He pled not guilty. The district attorney amended the indictment to allege second degree murder in violation of LSA-R.S. 14:30.1. Defendant was arraigned again and pled not guilty to that charge. After a trial by jury, defendant was found guilty as charged. He was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
On appeal, defendant asserts five assignments of error as a basis for reversal of his conviction and sentence, as follows:
1. The trial court erred in denying the defendant’s motion to exclude the testimony of Pamela Rogers;
2. The trial court erred in denying defendant’s motion to continue based on newly discovered evidence;
3. The trial court erred in finding that defendant had the mental capacity to determine the difference between right and wrong at the time of the offense;
*432 4. The trial court erred in granting the State’s motion to exclude evidence of the defendant’s history of blackouts;
5. The trial court erred in denying defendant’s objection to the State questioning the defendant regarding statements he allegedly made to a witness who refused to testify.
After a thorough review of the record and the errors assigned, we affirm defendant’s conviction and sentence.
PACTS
On August 9, 2002, seventy-year-old Samuel Trahan, who owned and ran Heavenly Bodies, an adult entertainment lounge in Houma, Louisiana, was found bludgeoned to death behind his business establishment. His longtime girlfriend, Andrea Bailey, discovered the body lying in a pool of blood at about 4:45 p.m. Andrea had visited Samuel at the lounge around lunchtime and saw defendant |sthere at the time. She spoke to Sam again by telephone at about 3:30 p.m. that day. She testified that the victim always had a large amount of cash on his person, which he carried bound in a rubber band.
Detective Lieutenant Leroy Lirette, Jr., was dispatched to the scene to photograph and take videotape of the crime scene. Later, Detective Lirette located the victim’s missing vehicle, which had been left in a hospital parking lot. Inside the car, he found a pillow that appeared to have bloodstains on it.
Further investigation led the police to Rachel Authement, one of the dancers who performed at the lounge. She reported that she received a call from the lounge shortly after lunch. The caller identified himself as Calvin and asked if she knew the whereabouts of her sister, who worked the day shift at the bar. Police quickly began to seek the defendant, Calvin Pitre, since he had been at the scene of the crime that afternoon. In the meantime, Calvin was trying to avoid contact with the authorities.
Linda Pitre, the defendant’s ex-sister-in-law, reported that Calvin appeared at her home sometime between 3:00 and 4:00 p.m. on the day of the murder. He was out of breath and very wet. He reported that he swam the bayou to get to her house. She suggested that he get out of his wet smelly clothes and she proceeded to wash them. Defendant asked her to call his mother. Then he told her that he did not want to go back to jail and that he thought he had killed someone. He claimed that the last thing he remembered was the victim locking up the lounge. He told her that when he “woke up,” he was lying on the ground beside Sam Trahan, and there was blood and money everywhere. Linda called his mother as he had asked. Linda observed one scratch on his face. Calvin did not appear to be intoxicated or under the influence of drugs. He spoke clearly at the time.
While he was at Linda’s home, defendant produced from his pocket a large amount of cash bound with a rubber band. He asked her to hide the money, but |4she refused to do so. He counted the money and told her it was about $480.00. He hid the money in the back of her home until he left about thirty minutes later with his mother and sisters, who had arrived to pick him up.
Later that evening, Linda put defendant’s clothes and tennis shoes in a bag and called the Sheriffs office to come and get them. By that time, she had already washed the clothes and shoes. On cross-examination, and after refreshing her recollection with the statement she made on the day of the murder, Linda confirmed that defendant told her to call his mother because he was in trouble. He also said, “I f — - up.” At one point, defendant told *433 her that he fell down some steps with the victim. He also made mention of a claw hammer. At another point he told her that he “blacked out.” Linda admitted that her statement given on the day of the murder did not contain any reference to a scratch on Calvin’s face or a report about his statement that he thought he had killed someone. However, she insisted at trial that he had made that statement to her.
Rhonda Dupre, defendant’s sister, was initially arrested as an accessory after the fact to first degree murder in connection with the case. At trial, she testified that defendant arrived at her house at about 6:30 p.m. and asked if he could ride with her to Lockport. He seemed coherent, although upset. During the drive, defendant told Rhonda that he was at Heavenly Bodies with Samuel Trahan and that the regular bartender did not show up. Dupre testified that according to the defendant, Sam asked him to go out the back door so that he could lock up. He said that was the last thing he remembered. He told her he did not know what had happened. But he also told her that he thought he had killed someone. He claimed he “blacked out” and woke up on the cement next to the victim. Defendant’s sister testified that Calvin was not a violent person and that she thought he would have told her if he actually knew he had killed the victim. Rhonda advised defendant to Isturn himself in, but he was unwilling to do so. Instead, he asked her to take him to a motel in Lockport. She did so.
That evening, Calvin’s mother arranged for Calvin to contact his cousin, Mark Pi-tre, an employee of Terrebonne Parish District Attorney. When Calvin reached Mark by phone, Calvin told him he thought the Sheriff might be looking for him. He indicated that he did not want to come back, but he might if Mark would pick him up. Calvin was coherent-and his speech was not slurred. Mark traveled with investigating officers to Lockport, where he apprehended his cousin. They returned together to the police station in Houma, arriving at about 11:30 p.m. Mark indicated that no one questioned defendant during the ride back to Houma. A few days later, Calvin’s mother contacted Mark to pick up money the defendant had left with his relatives. Mark also testified that, to his knowledge, defendant was not a violent person.
Over defense objection, Pamela Rogers testified for the prosecution. She stated that until the previous morning, she had never discussed the case with the prosecutor. Pamela knew Calvin Pitre very well. She spoke to him by phone frequently and often gave him rides. By coincidence, on August 9, 2002, deputies called her cell phone looking for her roommate, Noel, in connection, with an investigation of stolen rings. She was irritated that they had her cell phone number. At about 3:30 p.m., she called the Heavenly Bodies lounge, where Noel worked, to try to find out who gave out her number. She spoke to Calvin at the lounge. Then she went to the lounge looking for Noel at about 4:45 p.m., with her boyfriend, Larry Dunn, and two other friends. The group entered through the front door, and found no one there. They noticed that the back door was open a crack. Her friend Larry opened the back door, looked out, and called out. No one responded and they did not see anything out of the ordinary. Inside the building, she noticed the cash register drawer open a crack, but did not inspect it for damage. | fiThe group left and went on their way. When she learned of the homicide that evening, she returned to the lounge at about 6:00 p.m., reported that she and her friends had been there earlier, and gave the officers Calvin’s name and the address of his mother. Detectives telephoned Calvin’s mother, who reported *434 that he was riding around with his sister, Rhonda.
Pamela Rogers also testified that about a week earlier, Calvin had been in the lounge where she worked, the Half Moon, which is located near the crime scene. That evening, Calvin told her that he was low on cash and intended to beat someone up, and rob or kill them to get money. He further suggested he could do this to Sam Trahan since everyone knew he always carried lots of money. Pamela recalled that this happened the Thursday night before the murder during a weekly pool league match. She claimed that she did not report this recollection to the police because she learned that they had arrested Calvin for the crime and did not see a need to get further involved. The night of the murder, she did not supply the information because of all the “chaos” going on and it did not cross her mind at the time. Pamela insisted that she came forward to get justice for the victim and that she was being truthful. She explained that she first gave the information about the incriminatory statements made by Calvin when she arrived at court on August 19, 2003 in response to a defense subpoena. The witness was extensively cross-examined in an attempt to cast doubt on the veracity of her testimony.
Detective Thomas Cope, the lead detective on the case, had been dispatched to the scene and arrived at 5:23 p.m.. He and approximately ten other deputies interviewed at least twenty potential witnesses near the scene, but few turned out to have any pertinent information. Inside the lounge, he saw, that the drawer to the cash register was partially open and appeared to have been pried open. It still contained about $100.00. There was no evidence of a struggle inside the building. All the lounge furniture was in place and there was no blood noted inside. Outside, |7the victim was lying on his back behind the lounge between the air conditioner and a small tool shed. No weapons were found at the scene. Not long after arriving, he interviewed Pamela Rogers and Larry Dunn, who described their earlier visit to the bar. Detective Cope confirmed that because of the position of the body, they would not have been able to see it if it had been there when they looked out the back door. In the meantime, Lieutenant Le-Boeuf was investigating Calvin Pitre as a possible suspect. He learned from Mark Pitre that Calvin was attempting to turn himself in and that he had gone to Linda Pitre’s home earlier. He secured defendant’s clothing from Linda Pitre’s home.
When Calvin was returned to Houma after apprehension, Detectives Cope and LeBoeuf interrogated him after advising him of his Miranda rights. Calvin signed a waiver of rights form, indicating that he understood his rights and waived them. Defendant was coherent and did not appear to be impaired by drugs or alcohol. Detective Cope and Detective LeBoeuf testified that neither of them threatened or intimidated the defendant in any way to coerce a statement, nor made any promises to induce a confession. Defendant was told that he was being questioned in connection with Sam Trahan’s murder.
Initially, defendant denied having anything at all to do with the victim’s murder. However, he eventually confessed to information concerning the homicide. A tape-recorded statement given by defendant was played for the jurors. In his statement, defendant admitted that he had been with Sam Trahan for several hours on August 9, 2002. He became angry at Sam for telling him he could not continue hanging out at the lounge without buying the girls expensive drinks. That made him angry because he liked one of the girls who danced there. He claimed that at *435 some point, things went blurry. A few minutes later when the blurriness cleared, he saw Sam covered with blood on the cement. Calvin had blood all over his hands. Although he could not recall the murder, he thought he must have killed |RSam Trahan because they were both full of blood and no one else was there. A bloody, long, flat metal bar and a claw hammer were lying close to the body. Defendant gathered some of Sam’s money and fled the scene in Sam’s automobile, taking with him the bloody hammer and metal bar. He threw those items in the Intracoastal Canal. Then he carefully wiped his fingerprints from the automobile and abandoned it in a parking lot. He swam across the bayou and went to the home of Linda Gail.
In his statement, Calvin claimed that the back door had been locked and the alarm set before any of this occurred. However, there was no alarm going off when the police arrived, nor any report of an alarm. At the conclusion of the interrogation, Detective Cope was satisfied that defendant committed the murder and he had no indication that anyone else was involved. During his statement, defendant never suggested that he thought he had totally lost consciousness or that anyone had hit him on the head and knocked him out.
Dr. Feaster Fitzpatrick, an employee of the Terrebonne Parish Coroner’s Office, performed an autopsy on the victim. He testified that the death likely occurred between 3:30 and 4:30 p.m. that day. He noted wounds to the victim’s hands and arms, which he believed to be defensive wounds. The victim’s sternum had been broken and his abdomen was lacerated, consistent with having been struck with a flat iron object with jagged edges. Abrasions on the victim’s knees and another wound to the shoulder were consistent with the victim being beaten while on his hands and knees. There were also multiple wounds to the face and head. Blunt trauma to the head, just above the nose, penetrated about 6 inches into the brain and was the ultimate cause of death. Such force could have been the result of a hammer blow to the area. There were also circular wounds to the chest that appeared to be inflicted by the end of a pipe. The nature of the wounds indicated that as many as three weapons might have been used. He opined that the 13wounds had to have been inflicted by someone of significant size and strength. Blood would likely have splattered on the attacker and surrounding areas.
The twenty-five year old defendant testified on his own behalf. He admitted to having been convicted of nine prior offenses, including disturbing the peace, simple burglaries, felony theft, and possession of stolen property. Defendant testified that he “woke up” next to the victim, was scared, and did not want to go back to jail. He recalled that he spent most of the day with the victim. He also recalled arguing with the victim about his not buying expensive drinks for the dancers who worked there. He admitted to having a temper on occasion, but denied ever telling Pamela Rogers that he intended to beat up or rob the victim. According to defendant, he had experienced “blackouts” on other occasions. He related an incident during which he reportedly grabbed his little sister in 2002 and roughed her up. He claimed he did not recall doing so until told about the incident by his mother. Defendant also reported two to three other occasions of blacking out for about 15 to 20 minutes, but did not give any details about those instances. He did not recall ever having had a head injury but claimed he had reported dizziness and had experienced pain and/or blackouts about ten times since his arrest.
*436 On cross-examination, defendant was asked why he destroyed the evidence and did not call the police if he had nothing to hide. He responded that he did so because he was frightened. He gave the same explanation for taking the victim’s money and car. He admitted asking Linda Pitre to hide the money for him. He also admitted taking the victim’s car and wiping it clean of fingerprints. In fact, defendant acknowledged that his conduct was consistent with that of a guilty person. He testified that while in Lockport for about two hours, he drank at least ten beers and ingested two tablets of Xanax and one and one-half tablets of-Valium, for which he had no valid prescription.
|inHe insisted that he had been interrogated on the way back to Houma after being apprehended. He accused his cousin, Mark Pitre, of lying about the trip back to Houma. Defendant then also accused Pamela Rogers of lying about the conversation she reported during which he told her of his plan to beat and rob someone to get money. Defendant admitted that he told the officers that no one else was with him and the victim at the lounge, but insisted that he did not recall what happened. At trial, he testified that he had a knot on the back of his head when he awoke next to the victim. He admitted, however, that he did not complain of that to Linda Pitre, his sister Rhonda, or Detective Cope. No mention was made of this injury in his statement given to the police on the night of the murder.
Fay Miller, Calvin’s mother, testified that when she got to Linda Pitre’s house to pick up Calvin, she observed a knot and blood on the back of his head. She was the only witness, other than defendant, to testify that he had a lump on the head. She believed defendant “had a blackout” and testified that she has three children who all have blackouts. She did not, however, explain what she meant by a blackout and she did not seek any medical attention for defendant that day, giving the excuse that the car used to pick Calvin up had been borrowed. After Ms. Miller picked him up, Calvin went home with her. Then he went to his sister Rhonda’s house. Ms. Miller denied that Calvin told her what had happened. Nevertheless, she also claimed that she advised him to turn himself in, and she coordinated the defendant’s contact with Mark Pitre for that purpose. She admitted that around 5:45 p.m. a deputy had called her home and she reported that Calvin was riding around with Rhonda. Later that night, she eventually turned over to the authorities money that Calvin had given her.
At the close of the defense case, members of the Positerry family were called in an attempt to suggest that another unknown person may have committed the crime and that police had done a poor job of investigating the murder. Barbara | ¶1 Positerry had originally been called as a prospective juror. During voir dire examination, her responses established that she was a potential witness in the case.
At trial, Barbara Positerry testified that on the day of the murder, she was at her trucking business, JaBa Services, one block away from the crime scene. Also there were her husband, Joseph, daughter-in-law, JoEllen, and son, Randy. That afternoon they heard sirens and JoEllen went to investigate. She returned and told them there had been a murder at Heavenly Bodies. They all walked over to a nearby service station to watch the police activity for a while. About that same time, a scruffy-looking young white man in casual clothes came to their shop asking to use the phone. He reported that he had been at Kathy Shaw’s, another barroom in the area, all afternoon. He needed a ride home to Bayou Blue. Barbara allowed him *437 to use the phone. He eventually advised that he could not find a ride and left the shop. Barbara and her family thought it odd for the young man to ask to use their phone, assuming that he could just as easily have used one at Kathy Shaw’s. They even wondered whether he possibly was involved in the murder. However, he had no blood on him and was not in possession of any weapons.
The following Monday, Joseph Positerry found a girl’s bike in the back of their building. It had not been there the day before the Friday murder. Joseph left it there, thinking someone would return for it. A few days later, the bike still had not been retrieved. At that point, Barbara and Joseph noticed what they thought might be a small drop of blood on the seat and called the police, thinking that the bike might be related to the murder the prior week. An officer came out to investigate and collected the bike.
Joseph Positerry recalled that the young man who came to the shop to use the phone walked in about the same time the police were getting to the area. When an officer came to investigate the abandoned bike, Joseph was concerned about the |12way the officers were treating the evidence by putting it in the back of a water patrol truck. A few weeks later, Joseph called about the bike and was told. the police did not have it on hand and had no record of it. He intended to claim the bike because Barbara wanted it.
JoEllen Positerry was with her in-laws at the store. She walked through the parking lot of the nearby service station and saw the crowd gathered. She recognized the man who had asked to use the phone as someone she saw walking around the parking lot and being questioned by the police.
Deputy Wilton Leon, the officer who collected the bike in question, testified that he saw one small nickel-sized spot on the seat that might have been , blood. He was instructed to take the bike to the motor pool and tag it in as evidence, which he personally accomplished per instructions. The bike would not fit in his trunk and he called another officer to assist in getting it to the motor pool. He had no idea concerning what happened to the bike afterward.
At the time of the initial investigation, Barbara Positerry was not interviewed by the team at the crime scene, and she did not come forward as having any evidence regarding the crime. Detective Cope, the lead detective in the murder case, did not get a copy of the police report about the abandoned bike, which bore a different police item number from the murder case, until the day before the trial when Barbara disclosed this information to the prosecutor during voir dire.
In closing, defense counsel argued that the prosecution’s case was not believable because it did not make sense for defendant to stay with the victim all day and then decide to kill him. He also argued that since there were likely multiple weapons involved, there were probably multiple killers. He suggested that the victim was a large man, and thus, he probably put up a fight such that defendant would have had more obvious wounds if he had been the assailant. |1sFinally, he suggested that defendant had no history of violence and that since the police did not take any blood samples from the area, they did a poor job of investigating whether anyone else might have committed the crime.
The prosecutor pointed out that the defendant, also a large man, might well have struck an initial disabling blow. Moreover, defendant’s convenient claim that he could not remember the crime was inconsistent with the elaborate steps he took to conceal *438 himself, destroy evidence, and steal the victim’s money and car.
At the conclusion of trial, defendant was found guilty as charged by unanimous vote of the jurors.
ASSIGNMENT OF ERROR NUMBER 1
In this assignment of error, defendant argues that the trial judge erred in refusing to grant his motion to exclude the testimony of Pamela Rogers, who was called by the State to testify on the second day of testimony. He claims that notice of the State’s intended use of her testimony was untimely and that it constituted unfair surprise.[1] We do not agree.
Defense counsel subpoenaed Pamela Rogers as a witness for the defense. She appeared at the courthouse the morning of August 19, 2003 pursuant to that subpoena. Shortly before 9:00 a.m., one of the district attorney’s investigators was told by Ms. Rogers that she had been subpoenaed by the defendant, but that she had information that might be helpful to the prosecution. Ms. Rogers claimed that approximately one week before the murder, the defendant had confided in her that he needed money and intended to beat someone up and kill and/or rob them and that he could do that to Sam Trahan. The investigator immediately conveyed this information to the prosecuting attorney in the case.'
| uPrior to Ms. Rogers’ revelation of incriminating evidence on August 19, 2003, the only knowledge the prosecuting attorney had of Ms. Rogers was from a police report documenting a police interview with her shortly after the crime, at which time she reported that she and several friends had gone to Heavenly Bodies at about 4:55 p.m. and found the lounge empty. The police report documenting that interview did not contain any information about the incriminating conversation between the witness and defendant because Ms. Rogers did not report the conversation at the time.
Defense counsel conceded that the prosecutor acted in good faith and that he did not know of the incriminating information from Ms. Rogers until the morning of August 19, 2003. Moreover, he conceded that the police report made at the time of the initial investigation had been turned over to defense counsel during discovery. The State had entered into an agreement to provide open file discovery to the defendant. Defense counsel further admitted that the prosecutor provided notice of the intended use of the incriminating evidence immediately after receiving it and prior to opening statements. Nevertheless, defense counsel moved to exclude Ms. Rogers’ testimony before the commencement of the taking of evidence and again when she was called by the State as a witness.[2]
Louisiana Code of Criminal Procedure article 716(B) provides:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral eonfes *439 sion or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony, to permit the defense to meet the State’s case, and 11sto allow proper assessment of the strength of its evidence in preparing a defense. However, the failure of the State to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. State v. Sanders, 93-0001, p. 9 (La.11/30/94), 648 So.2d 1272, 1281, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); State v. Schrader, 518 So.2d 1024, 1032 (La.1988). When the defendant is lulled into misapprehension of the strength of the State’s case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which constitutes reversible error. State v. Mitchell, 412 So.2d 1042, 1044 (La.1982). Louisiana Code of Criminal Procedure article 729.5 details the arsenal of sanctions available for discovery violations. Even where a violation is clear, no particular remedy is mandated.
In this case, defense counsel argues that he did not have a fair opportunity to prepare for cross-examination or to locate other witnesses who might have overheard the alleged incriminatory statement and impeached Ms. Rogers’ testimony. He further complained at trial that he would not be able to question the detective who took her initial statement before cross-examination of Pamela Rogers. Finally, he argued that he would not have time to file a motion to suppress her testimony or to investigate whether she might have an ulterior motive for testifying against the defendant. He asked the trial judge to exclude her testimony or delay her taking the stand until the next day.
After a thorough* review of the record, we are not persuaded that the failure of the trial judge to grant defendant’s alternative requests justifies a reversal of the defendant’s conviction under the particular circumstances presented here. In our view, the State complied with both the letter and the spirit of the law. Full good-faith pre-trial discovery was provided prior to trial. The State was obviously aware it had a continuing duty to supplement discovery and, as soon as the prosecution |-i filearned of Rogers’ new information, it notified defendant prior to the State’s opening statement. In our view, the trial judge did not err in refusing to exclude this testimony.
Moreover, although he did not exclude the highly relevant testimony, the trial judge went to great lengths to avoid any undue prejudice to the defendant. He assured defense counsel that he could fully cross-examine the witness and that he would allow him to subpoena any other person he learned of during cross-examination who overheard the conversation in dispute. In addition, he indicated that defense counsel would have the right to recall Ms. Rogers if he chose to do so. Thus, defense counsel effectively had the one day of extra time to investigate that he requested and could have recalled the witness. We cannot conclude that the timing of the notice in this case, considering the nature of the evidence at issue, resulted in the proceedings being fundamentally unfair. See State v. Allnet, 419 So.2d 472, 475 (La.1982); State v. Hebert, 443 So.2d 613, 615-616 (La.App. 3d Cir.1983), writ denied, 444 So.2d 1215 (La.1984).
Defense counsel extensively cross-examined the witness. She explained that she did not report defendant’s inculpatory *440 statement on the evening of the murder because of the chaos going on with all of the police activity. She further indicated that other patrons of the lounge where she worked were not around defendant at the time of the disputed inculpatory statement. In any event, she could not recall who they might have been. The only person she identified who might have overheard the conversation was her boss, Melinda Berti-not, who happened to also be defendant’s aunt. Ms. Rogers provided a phone number for Ms. Bertinot, but defendant did not call her as a witness. There is no indication that he made any attempt to subpoena her as a witness. At the end of her testimony, Ms. Rogers was advised that she was still under subpoena and might be recalled as a witness. Defense counsel did not choose to recall her. There is nothing to suggest that the l17defense could have done anything more to discredit this witness, no matter how much time had been available for investigation.
Defendant took the stand and denied that he ever had the incriminating conversation with Ms. Rogers. However, he made no claim whatsoever that Ms. Rogers had any animosity toward, him, nor did he suggest any reason why she might have fabricated this story. In sum, the testimony offered by this witness was extremely relevant to the State’s case, and we find no error in the trial judge’s handling of defendant’s objections with respect to the testimony of Pamela Rogers.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 2
In this assignment of error, defendant argues that the trial court erred in failing to grant a requested continuance. We disagree and find no merit to this argument.
After the jury was sworn and before the commencement of testimony, defense counsel complained that the evidence the Positerry family had to offer about the bicycle found behind their building and the young man who used their phone the evening of the murder constituted Brady material that was not supplied to the defense. The prosecutor assured the court that there was nothing in his file to indicate anything about a bicycle obtained from the Positerry family or about the young man in question. Defense counsel indicated that he needed time to look into this information and moved for a continuance. His request would more properly have been characterized as a request for a recess, since trial had already begun. See LSA-C.Cr.P. art. 708. The trial judge denied the motion but granted instanter subpoenas for all of the members of the Positerry family that defense counsel wanted to question.
It is well settled that the State has an affirmative duty to disclose exculpatory evidence favorable to the defendant. Brady v. Maryland, 373 U.S. 83, 86-87, 83 SCt.18 1194, 1196-1197, 10 L.Ed.2d 215 (1963). But in order to prove a Brady violation, the defendant must establish, inter alia, that the evidence in question was, in fact, exculpatory or impeaching. State v. Garrick, 2003-0137, at p. 6 (La.4/14/04), 870 So.2d 990, 993. And, contrary to the statements of the prosecutor and defense counsel, the State can be held accountable to disclose Brady information known to those acting on the government’s behalf, even if the information is not known to the district attorney prosecuting the case and providing discovery. Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).
Disclosure of exculpatory evidence should be made in time to allow a *441 defendant to make effective use of such information in the presentation of his ease. State v. Prudholm, 446 So.2d 729, 738 (La.1984). However, even where disclosure is made during trial, it will be considered timely if the defendant is not prejudiced. State v. Huls, 95-0541, pp. 12-13 (La.App. 1st Cir.5/29/96), 676 So.2d 160, 170, writ denied, 96-1734 (La.1/6/97), 685 So.2d 126. In order to be entitled to a reversal for failure to timely provide exculpatory information, the defendant must show that he was prejudiced. Discovery violations do not provide grounds for reversal unless they have actually prejudiced the defendant. State v. Garrick, 2003-0137 at p. 5, 870 So.2d at 993.
A discovery violation involving the State’s failure to disclose exculpatory evidence does not require reversal as a matter of the Due Process Clause unless the nondisclosure was so serious that there is a reasonable probability that the supr pressed evidence would have produced a different verdict. State v. Garrick, 2003-0137 at p. 5, 870 So.2d at 993. While late disclosure, as well as nondisclosure, of exculpatory evidence may deprive the defendant of a fair trial, in both instances the impact on the defense “must be evaluated in the context of the |1flentire record.” State v. Kemp, 2000-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545.
In this case, the evidence in question was disclosed during voir dire examination. At the outset, we note that it is questionable whether the information provided by the Positerrys constituted Brady information. The young man who used the Posi-terry business telephone remained in the area of the murder while the police investigated the case and was interviewed by the police. Apparently, he had no relevant information and was not considered a suspect. He used the telephone around the time the police arrived, which was not long after the brutal murder. He had no blood on his clothing and there was no evidence whatsoever to link him to the crime. Moreover, the Positerrys did not report him to the authorities at the time.
We similarly question whether the evidence regarding the bicycle constituted Brady material. The bicycle was not noticed until days after the murder. The testimony at trial clearly established that there were numerous drifters, panhandlers, and others in the area. In fact, Joseph Positerry testified that many people ride bikes in the area and he left the bicycle outside for three additional days thinking someone would come back to get it. The bicycle was a girl’s bicycle, and the testimony of Dr. Fitzpatrick suggested that it was unlikely to think that a female could have committed the murder. Moreover, no one testified to seeing anyone riding a bicycle anywhere near the murder scene at any relevant time. The spot on the seat that was suspected by the Positerrys of being blood was never confirmed to be blood. And even if it were blood, there is no reason to believe that a single drop of blood found a block away was blood of the victim or the murderer. Thus, we are not persuaded that evidence of the presence of the bike constituted Brady material.
^However, even if we were to assume arguendo that the evidence offered by the Positerrys was Brady information, this information was provided to defense counsel during voir dire examination. The record shows that the testimony provided by the Positerry family coincided with the defense that counsel had undertaken. Defense counsel integrated the unanticipated testimony into his overall defense and asserted that there might have been another person involved who got away due to sloppy police work. There is no indication whatsoever that this opportunity could have been enhanced with more investiga *442 tive time. The record shows that the trial court’s denial of a postponement of this evidentiary portion of the trial did not prejudice the defense or otherwise render the proceedings fundamentally unfair. Defense counsel had an opportunity to offer the testimony of Barbara, Joseph and JoEllen Positerry, as well as the testimony of the officer who investigated their call about the bicycle and took it to the motor pool to be tagged as evidence. The jury heard the evidence and obviously was not persuaded that it established reasonable doubt that the defendant committed the crime. Under the particular facts and circumstances of this case, we cannot conclude that the trial judge erred in refusing to grant defendant’s request for a recess. Compare State v. Jones, 395 So.2d 751, 753 (La.1981)..
This assignment of error also lacks merit.
ASSIGNMENT OF ERROR NUMBER 3
Defendant contends the trial judge erred in ruling that he had the mental capacity to determine the difference between right and wrong at the time of the offense. A “sanity hearing” was convened on August 1, 2003. At the conclusion of the hearing, the trial judge ruled that defendant was competent to stand trial. He additionally opined that defendant had not proven by a preponderance of the evidence that he was legally insane at the time of the offense.
h,iPursuant .to LSA-C.Cr.P. art. 651, when a defendant is tried upon a plea of not guilty, as occurred in this case, evidence of insanity or mental defect at the time of the offense shall not be admissible. Moreover, even where insanity is legitimately at issue because a defendant has pled not guilty and not guilty by reason of insanity, the court is prohibited from determining defendant’s sanity at the time of the offense. This issue is reserved for the jury. State v. Sonnier, 379 So.2d 1336, 1347 (La.1979). Thus, to the extent that the views expressed by the trial judge at the sanity hearing might be interpreted as a ruling on defendant’s sanity at the time of the offense, it was not within the province of the trial judge to make such a ruling. To that extent, we agree that the trial judge erred in making this determination. However, the ruling of the trial judge was utterly harmless. Defendant did not plead insanity at the time of the offense. For this reason, he was legally precluded from attempting to prove his insanity at the time of the offense during trial. Thus, any opinion expressed by the trial judge on this issue at the sanity hearing was irrelevant and non-prejudicial.
Furthermore, although defendant now complains that the physicians appointed to examine him did not examine him for an organic brain defect, this complaint is similarly without merit. Since the only plea entered was a plea of not guilty, the only relevant finding the sanity commission could have made was with respect to defendant’s competence to stand trial. Defendant does not complain about the trial judge’s ruling that he was competent to stand trial. And since no evidence of alleged insanity was admissible at trial, the quality of the investigation of the sanity commission into that issue had no effect whatsoever on the proceedings;
This assignment of error likewise lacks merit.
| ^ASSIGNMENT OF ERROR NUMBER 4
Defendant contends the trial judge erred in granting the State’s motion to exclude evidence of the defendant’s history of “blackouts.” We disagree.
*443 In order to properly evaluate this assignment of error, it is necessary to first understand what the defendant meant when he claimed that he “blacked out” during the time the murder was committed. On the night of the murder, defendant gave a recorded statement to the police that was ruled by the court to be free and voluntary. In that statement, defendant claimed that he went out the back door of the lounge and the victim met him behind the building after locking up. Defendant claimed that Samuel Trahan told defendant that he could not hang out around the bar anymore unless he purchased more expensive drinks for the girls. Defendant got angry because he liked one of the girls who worked there. He described what happened as follows: “It went blurry and a few minutes later he was laying on the ground.”[3] ' Defendant claimed he could not remember exactly what happened. He further explained: “When I first started seeing it was a little blurry, then it cleared up. I seen him laying on the ground full of blood, my hands were full of blood and on the side of him it had a little piece of metal that had blood on it and a hammer by his leg.” Defendant further described: “When I come when I when the blurriness went away I seen him and I freaked out.” At another point, defendant indicated: ‘We was the only we was the onliest two there and he’s full of blood and I was full of blood” and “I had to have did it.”
It is clear from the defendant’s statement on the night of the offense that he did not believe he had blacked out in the sense of fainting or completely losing consciousness such that he could not have physically committed the murder. Rather, he meant that although he might have physically committed the act, he l^could not mentally recall having done so. This is further made clear by defendant’s testimony at trial. He claimed that he had a history of “blackouts” and gave as an example an occasion when he roughed up his sister, but could not recall having done so. Thus, while defense counsel argues on appeal that the crux of the defense was that the defendant suffered a “blackout” and, while counsel seems to posit that there might have been a loss of consciousness such that defendant could not have committed the crime, the facts as presented by the defendant himself represent otherwise.
The State filed a motion in limine to preclude defendant from offering evidence in support of his claim of alleged loss of memory, amnesia, or blackouts with regard to the murder of Sam Trahan. In support of that motion, the State relied on LSA-C.Cr.P. art. 651, which provides that a defendant cannot introduce evidence of a mental disease or defect unless he pleads not guilty and not guilty by reason of insanity. The State further relied upon cases holding that amnesia is a mental defect within the meaning of LSA-C.Cr.P. art. 651. See State v. Lecompte, 371 So.2d 239, 243 (La.1978); State v. James, 241 La. 233,128 So.2d 21, 23-24 (1961).
A hearing was held on the State’s motion. When the State argued that amnesia was a mental defect that was not admissible, defense counsel did not protest that “amnesia” was not what his client meant by the term “blackout.” The trial judge ruled that since defendant was proceeding to trial with a plea of not guilty, he would not admit evidence of insanity or mental defect at the time of the offense if offered by third parties. Defense counsel objected to the ruling and indicated that it had been his intention to ask family members about defendant’s history of “blackouts.”
*444 It is well settled that LSA-C.Cr.P. art. 651 precludes the introduction of evidence of mental disease or defect where the defendant proceeds to trial on a | ^plea of not guilty and does not place his sanity at the time of the offense at issue through a formal plea. State v. Allen, 633 So.2d 325, 328 (La.App. 1st Cir.1993); State v. Johnson, 475 So.2d 394, 397 (La. App. 1st Cir.), writ denied, 478 So.2d 143 (La.1985). Amnesia is a mental defect within the meaning of the article. State v. Roussel, 424 So.2d 226, 229-230 (La.1982). Instances include a defendant’s denial of recall of the events of a crime, evidence of a prior mental condition to explain his lack of recall is inadmissible, even if only offered to corroborate defendant’s explanation of why he cannot testify about the event surrounding the crime. State v. Dixon, 95-0269, p. 3 (La.App. 4th Cir.1/19/96), 668 So.2d 388, writ denied, 96-0332 (La.5/17/96), 673 So.2d 608, cert. denied, 519 U.S. 983, 117 S.Ct. 438, 136 L.Ed.2d 335 (1996).
Louisiana does not recognize the defense of diminished capacity. A mental disease or defect short of insanity cannot serve to negate an element of the crime. State v. Stewart, 93-0708 (La App. 1st Cir. 3/11/94), 633 So.2d 925, 934 writ denied, 94-0860 (La.9/16/94), 642 So.2d 189. For that reason such evidence is not relevant to the issue of a defendant’s guilt or innocence. State v. Carter, 97-2902, p. 18 (La.App. 4th Cir.5/10/00)/ 762 So.2d 662, 675, writ denied, 2000-1598 (La.6/15/01), 793 So.2d 1233, cert. denied, 534 U.S. 1116, 122 S.Ct. 926, 151 L.Ed.2d 889 (2002).[4] Moreover, evidence of a mental disease or defect affecting defendant at the time of an offense is inadmissible, whether it is an organically caused mental condition or a psychologically or emotionally induced mental condition. State v. Anseman, 607 So.2d 665, 670 (La.App. 5th Cir.1992), writ denied, 613 So.2d 989, 990 (La.1993).
LJn short, the trial judge did not err in granting the State’s motion to exclude evidence of mental disease or defect in this case. There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NUMBER 5
Defendant contends the trial judge erred in allowing the State to question him, over his objection, about statements made to an inmate who refused to testify at trial.
During the State’s investigation of the case, a fellow inmate of defendant contacted the district attorney and offered to give testimony against the defendant if he were given some favorable treatment in return. The inmate, Allen Purcell, was interviewed, and a sentencing accommodation was arranged in connection with his agreement to be a witness. He advised that defendant had told him in jail that “when you kill someone, you feel like Superman for about five minutes.”’ Written notice of the intended use of the testimony of Purcell, along with Purcell’s sworn statement, was provided to defense counsel on January 23, 2003 and again on July 16, 2003. When called as a witness, however, Purcell *445 refused to testify. The trial judge appointed an attorney to represent the reluctant witness. Purcell was advised that he could be held in contempt and that the sentencing agreement with the State could be rescinded if he refused to testify; he still refused to testify. Because the prosecutor had alluded to this witness during opening statement, the trial judge agreed to admonish the jury that Purcell’s failure to testify was through no fault of the prosecution or the defense.
Defendant took the stand in his own defense. During cross-examination, the prosecutor asked whether defendant knew Purcell and whether he had told Purcell that killing someone makes you feel like Superman for about five minutes. Defense counsel objected and moved for a mistrial. His objection and motion were overruled. Defendant denied making the statement.
DfiOn appeal, defendant argues that this line of questioning was more prejudicial than probative , and that, since Purcell would not testify, the question somehow denied defendant his right to confrontation. We do not agree. When defendant took the stand he subjected himself to cross-examination. The prosecutor had good cause to believe that defendant had made the statement to Purcell. On cross-examination, the State was entitled to ask defendant to admit or deny the statement. Since Purcell did not testify against him, defendant’s constitutional right to confront Purcell was not implicated.
This assignment of error is also without merit.
CONVICTION AND SENTENCE AFFIRMED.

. Although references are made in the appellate briefs as to whether or not the trial judge should have granted a continuance, defense counsel did not move for a continuance or a recess of the trial. At most, he asked that the trial judge delay Ms. Rogers' taking the stand to testify until the following day. Thus, the precise issue of whether a recess should have been granted is not before us on appeal.

. At trial, all counsel discussed the timeliness of the notice in terms of whether the notice complied with LSA-C.Cr.P. art. 768. However, since the statement in question was made before the murder, it does not fall into the category of inculpatory statements addressed by that article. See State v. Harris, 2000-3459, p. 7 n. 9 (La.2/26/02), 812 So.2d 612, 616 n. 9.

. References are to a transcript of the recorded statement introduced into evidence without objection at the defendant's motion to suppress his confession.

. Compare State v. Whitton, 99-1953, pp. 17-19 (La.App. 4th Cir.9/27/00), 770 So.2d 844, 854 and State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, both discussing evidence of mental disease or-defect offered to challenge the free and voluntary nature of a confession. In this case, defendant did not seek to suppress his confession on the basis of mental disease or defect. Nor does he assign as error the admission of his taped confession into evidence at trial. Because the free and voluntary nature of defendant’s confession is not at issue, we consider these cases, which dealt with the use of evidence of mental state in that limited context, to be clearly distinguishable.