STATE OF LOUISIANA,
v.
CHAD MICHAEL BREAUX.
No. 2009 KA 0196.
Court of Appeals of Louisiana, First Circuit.
June 19, 2009.
Not Designated for Publication.
JOSEPH WAITZ, District Attorney, JUAN PICKETT, ELLEN DAIGLE DOSKEY, Assistant District Attorneys, Attorneys for State of Louisiana.
KATHERINE M. FRANKS, Attorney for Defendant-Appellant Chad Michael Breaux.
Before: PETTIGREW, McDONALD, and HUGHES, JJ.
PETTIGREW, J.
Defendant, Chad Michael Breaux, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. Defendant entered a plea of not guilty and was tried before a jury. The jury unanimously determined defendant was guilty. The defendant was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.
Defendant appeals, citing the following as error:
1. The trial judge erred when he denied the defense challenges of Dorothy Bergeron (Panel 1) and Milton [Roussel] (Panel 2) for cause and compelled the defense to utilize peremptory challenges to [excuse] them from the jury. Because the defense exhausted its peremptory challenges, prejudice is presumed.
2. The trial judge erred in failing to invoke a sanity commission when defense counsel questioned [defendant's] capacity to proceed to sentencing and his sanity at the time of the offense. The evidence submitted with the request, as well as the evidence adduced at trial, demonstrated that [defendant] had suffered since youth from psychoses that intermittently placed him out of contact with his surroundings and subjected him to hallucinations and depression, making the guilty verdict not a reliable one, and the sentencing, without certainty of his capacity to proceed, a violation of Due Process.
We affirm defendant's conviction and sentence.

FACTS
In June 2007, Geannie Breaux, the victim, and her fifteen-year-old daughter. Crystal, moved in with Dean Breaux at his mobile home residence, located at 109 Laura Lynn Lane in Houma. According to Dean, the victim had talked him into repairing the relationship with his son, the defendant. In July 2007, defendant moved in with his father, the victim, and her daughter. For approximately one month, everyone lived together peacefully.
On August 7, 2007, Crystal told the victim that defendant asked her to provide a urine sample so he could apply for a job. Crystal also related to her mother that defendant kept drugs in the residence and was using them. The victim told Dean what she had learned when he arrived home for lunch. Dean went back to work for the afternoon, but when he returned home at approximately 6:00 p.m., he confronted defendant about what the victim had told him. An argument ensued, with Dean ordering defendant to leave the residence.
During the argument, the victim contacted the Terrebonne Parish Sheriffs Office. Officer Tara Pitre responded to the dispatch and escorted defendant away from Dean's residence. Officer Pitre transported defendant and his dog to the residence of Dean's former girlfriend, who lived approximately one-half mile away at Capri Court. Officer Pitre instructed defendant to contact another deputy when he was ready to retrieve his belongings from his father's house.
At approximately 10:00 a.m. the following day, Officer Pitre noticed defendant walking along the side of the road near Capri Court, dressed in the same clothing he was wearing the previous night. At noon that day. Dean returned to his residence and had lunch with the victim. As he left, the victim was preparing to take a nap on the sofa.
At approximately 3:00 p.m., Marty Breaux, defendant's uncle, was at his residence in Mathews, Louisiana. Marty was in his bedroom when he heard knocking on his window. When Marty looked up, he saw defendant. Defendant was wearing black pants and no shirt. Marty opened the window, and defendant asked to see his two children who lived at the residence with Marty's sister (defendant's aunt) and defendant's grandparents. Marty asked defendant why he wanted to see his children. Defendant replied he wanted to see them before he went to jail. Defendant subsequently explained that he thought he had killed the victim. Marty told defendant that his daughter was at school and his son was taking a nap and then encouraged defendant to turn himself in to the police. Marty walked out the front door of the residence and watched as the defendant slowly drove away in Dean's truck. As he drove away, defendant told Marty that he loved them.
A short distance away lived Mark Breaux, a friend of the defendant. That afternoon, defendant knocked on Mark's door and asked for Mark. Defendant was wearing pants, no shirt, and a bandana around his neck. Mark described defendant as "emotional" and indicated defendant had what appeared to be blood spots on his body. Defendant asked Mark if he wanted his dog, and then asked for something to drink. Mark let defendant inside his residence and gave him a Sprite. After defendant consumed the Sprite, he said he had done something bad. Mark described defendant as "wired up."
Defendant told Mark he wanted to see his children before he turned himself in, explaining that he had killed his father's girlfriend with a baseball bat and that he had wiped her brains off his forehead. After defendant left, Mark contacted Detective Chad Shelby of the Lafourche Parish Sheriffs Office and reported the encounter to him. Mark followed defendant until he saw defendant stop at a nearby snowball stand. Police units arrived shortly thereafter, and Mark returned home. Defendant was placed under arrest.
In the meantime, the victim's body had been discovered covered under a blanket on the sofa in Dean's residence. A subsequent autopsy indicated that the victim was killed by blunt trauma to the head. Dr. Feaster Fitzpatrick, accepted by the trial court as an expert in pathology, performed the autopsy on the victim. According to Dr. Fitzpatrick, the victim sustained at least three blows to the head.
A bloody baseball bat was discovered under the back deck of Dean's trailer. A blood sample taken from the baseball bat matched the victim's DNA profile. Subsequent DNA testing of blood removed from defendant's arm matched the victim's DNA profile.
Following his arrest and waiver of Miranda rights, defendant told Detective Shelby he had been off his medication and could not remember actually going to his father's residence. According to defendant, all he could remember was waking up under a back step and being "full of blood." Defendant told Detective Shelby he then entered the trailer, took his father's truck keys, and drove away. Defendant indicated that as he was driving, he took off his shirt and threw it from the truck; however, the shirt was never recovered. According to Detective Shelby, defendant was very upset and crying during questioning, but appeared to be very honest and truthful.

DENIAL OF CHALLENGES FOR CAUSE  PRETRIAL PUBLICITY
In his first assignment of error, defendant argues the trial judge erred in denying the defense challenges for cause of Dorothy Bergeron and Milton Roussel and in compelling the defense to utilize peremptory challenges to excuse them from the jury.
According to the record, defendant exhausted his peremptory challenges. Thus, if he establishes an erroneous denial of a defense challenge for cause, prejudice is presumed and there is reversible trial court error. State v. Huls, 95-0541, p. 17 (La. App. 1 Cir. 5/29/96), 676 So.2d 160, 172, writ denied, 96-1734 (La. 1/6/97), 685 So.2d 126.
The State or the defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and evidence. La. Code Crim. P. art. 797(2). The trial court is vested with broad discretion in ruling on challenges for cause, and its ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. When a potential juror forms an opinion of the defendant's guilt that is derived from news publicity, the trial court should grant the defendant's challenge for cause of the prospective juror unless the juror declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence. State v. Frank, 99-0553, pp. 18-19 (La. 1/17/01), 803 So.2d 1, 18.
A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has expressed an opinion seemingly prejudicial to the defendant, if the juror, upon further inquiry or instruction, demonstrates that he or she is willing and able to decide the case impartially and according to the law. A juror need not be totally ignorant of the facts involved with the case. If a juror who has acquired knowledge about the case through the media can sufficiently lay aside his or her impression of the defendant's guilt or innocence and render a verdict based on the evidence presented, he or she is competent to serve as a juror. State v. Frank, 99-0553 at 19, 803 So.2d at 18.
During voir dire examination, the trial court asked whether any of the prospective jurors had ever heard or read anything about this case. Bergeron replied that she had read about the incident when it was first reported in the newspaper.[1] In response to the trial court's inquiries, Bergeron stated she did not believe everything she read in the local newspaper and had no opinion regarding the defendant's guilt or innocence.
Later, Bergeron was questioned in chambers and admitted that in addition to the initial newspaper article regarding this incident, she had read another small article that appeared in the newspaper two days earlier. Bergeron stated that she knew she was being called for jury duty and wondered if that was the case at issue. Bergeron indicated that she recalled the incident involved defendant's father's girlfriend being bludgeoned to death, although she had no recollection of the weapon used. In response to direct questioning, Bergeron reiterated that she had not formed an opinion about defendant's guilt or innocence and that she could be fair. Later, in the courtroom, Bergeron promised she would not make up her mind before hearing all the evidence, and assured the court that regardless of what she read, she could decide the case based on the evidence presented.
Roussel also acknowledged that he had heard about the case. According to Roussel, his wife had called him, knowing that he had jury duty. Roussel's wife read an article in the newspaper and told him that the defendant was accused of bludgeoning his father's girlfriend to death. Roussel stated that he did not believe everything in the newspaper and had not formed an opinion of the defendant's guilt or innocence. Roussel stated he could be fair, despite the fact he had heard something about the case.
The responses of both Bergeron and Roussel indicated that both assured the court that they could be fair and impartial. Further, despite having some knowledge about the case, both Bergeron and Roussel indicated they had not formed an opinion regarding defendant's guilt or innocence.[2] Thus, we find no abuse of discretion in the trial court's denials of these challenges for cause.

MOTION FOR A SANITY COMMISSION
In his second assignment of error, defendant argues the trial court erred in failing to invoke a sanity commission when defense counsel questioned defendant's capacity to proceed to sentencing and his sanity at the time of the offense.
Following the jury's verdict, defense counsel filed an Application for Appointment of a Sanity Commission. In the pleading, defense counsel alleged:
There is good reason to believe that [defendant], does not presently have the mental capacity to understand the proceedings against him or to assist in his defense and that [defendant's] mental incapacity to proceed exists because of, or as a result of, mental disease or defect. Likewise, there is good reason to believe that [defendant], does not have the mental capacity to be criminally liable for his actions at the time of the alleged aforementioned offenses. This belief is based on interviews by applicant with [defendant].
The appointment of a sanity commission is not a perfunctory matter or ministerial duty of the trial court, nor is it guaranteed to every accused in every case. The fact that defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant; rather, it must have reasonable grounds to doubt the defendant's mental capacity. See La. Code Crim. P. art. 643 & comment (a). The ordering of a sanity commission to inquire into the defendant's capacity to proceed rests in the sound discretion of the trial court. State v. Robinson, 92-1057, pp. 2-3 (La. App. 1 Cir. 5/5/95), 655 So.2d 517, 519. The defendant's mental incapacity to proceed may be raised by the defense, the district attorney, or the court at any time, even after conviction, as a reason why sentence should not be passed. La. Code Crim. P. art. 642; State v. Clark, 367 So.2d 311, 313 (La. 1979).
In support of the application, defense counsel attached defendant's discharge summary from Bayou Oaks Hospital dated June 6, 1988, when defendant was eight years old. According to the discharge summary, defendant was diagnosed with atypical psychosis and placed on anti-psychotic medication. In denying defendant's application for the sanity commission, the trial court noted that the Bayou Oaks discharge report was too removed in time from the incident at issue to allow defendant to proceed to a sanity commission. We agree and further note that the remainder of the record fails to support the appointment of a sanity commission on the basis that defendant lacked the capacity to understand the proceedings (at that point  sentencing) against him. At no time did defense counsel provide the trial court with any reason to suggest defendant could not understand the nature of the proceedings against him.
Moreover, we note that defendant's motion also raised his sanity at the time of the offense. Defendant entered a plea of not guilty and did not enter a plea of not guilty by reason of insanity. In opening statements, defense counsel maintained the incident was manslaughter, and at no time during trial was the defendant's mental capacity during the trial or at the time of the offense questioned.
Louisiana Code of Criminal Procedure article 651 provides, "When a defendant is tried upon a plea of `not guilty', evidence of insanity or mental defect at the time of the offense shall not be admissible." Thus, because defendant failed to enter a plea of not guilty by reason of insanity, he is prohibited from urging such issue following his conviction. See State v. Pitre, XXXX-XXXX, pp. 22-23 (La. App. 1 Cir. 12/17/04), 901 So.2d 428, 443-44, writ denied, XXXX-XXXX (La. 5/13/05), 902 So.2d 1018. We further note that other than defendant's offering of his nearly twenty-year-old discharge records from Bayou Oaks Hospital, no other allegations were made regarding his sanity at the time of the offense.
Considering the record as a whole, we do not find that the trial court erred in denying defendant's Application to Appoint a Sanity Commission. Defendant failed to allege any evidence that would support reasonable grounds that he lacked the requisite mental sanity at the time of the offense or to understand the nature of the proceedings against him.
This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The incident occurred on August 8, 2007. Jury selection commenced on January 23, 2008.
[2] Defendant argues that the responses of Bergeron and Roussel were no different than the responses of Clifford Quinn, who was excused for cause. We disagree. Quinn indicated he had previously read an article about this incident. When the trial court questioned Quinn on whether he had formed an opinion regarding the guilt or innocence of defendant, Quinn responded, "It's kind of hard not to go against  as much as they sensationalize everything." Later, Quinn admitted that he would not be impartial as a result of reading the article about the incident.