834 So.2d 572 (2002)
STATE of Louisiana
v.
Leslie JEFFERSON.
No. 2002-KA-1159.
Court of Appeal of Louisiana, Fourth Circuit.
December 4, 2002.
*573 Harry F. Connick, District Attorney, Anne M. Dickerson, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS, SR., Judge TERRI F. LOVE).
TERRI F. LOVE.
Defendant, Leslie Jamal Jefferson, was convicted of manslaughter and sentenced to twenty-five years at hard labor without benefits. On appeal, he alleges the sentence was excessive. For the reasons assigned below, we affirm the defendant's sentence and conviction.
FACTS AND PROCEDURAL HISTORY
On September 16, 2000, Leslie Jamal Jefferson[1] ("Jefferson") was charged by bill of indictment with first degree murder in violation of La. R.S. 14:30(1). At his arraignment on November 21st, he pleaded not guilty. After a two-day trial, a twelve-person jury found Jefferson guilty of the responsive verdict of manslaughter. The trial court ordered a pre-sentencing investigatory report, and the State filed a motion to invoke the firearm sentencing provisions under La.C.Cr.P. art. 893.1. On September 27th, three State witnesses testified. On October 5th, Jefferson was sentenced under La.C.Cr.P. art. 893.3, the article governing penalties in crimes where a firearm is discharged, to serve twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence. The defendant was granted an out-of-time appeal on December 5th.
Sergeant Daniel Scanlan was the primary investigator in the murder case occurring at 2111 Joseph Street on September 16, 2000. When he arrived on the scene, he found items left behind by the emergency medical technicians in the front yard. In the upper apartment a bullet hole was found in a window of the front room, a blood smear on the bathroom doorknob, and two "strike marks" on the wall of the front room; the sergeant believed bullets had caused the marks. The victim's body was found there. Ivan Medina ("Medina") was in the apartment, and he told the sergeant what had occurred. As a result of the conversation, the sergeant obtained an arrest warrant for Jefferson.
*574 Dr. Richard Tracey ("Dr.Tracey"), an expert in forensic pathology, performed an autopsy on Glenn Messerole ("Messerole") on September 16, 2000. Dr. Tracey found that the victim died of a gunshot wound to the chest which entered in front of his left shoulder, went through the right lung, the heart, the left lung, and exited the left flank. A second gunshot wound entered his scalp at the back of the head and exited near the left ear. The "stippling" or gunpowder on the victim indicated that the discharge of the gun was within inches of the victim's skin. The victim's body fluids were analyzed, and the resulting laboratory report showed his blood alcohol level was 0.14% and cocaine was found in his system. Dr. Tracey also reviewed the medical reports from Charity Hospital concerning Shawn Patrick Dolan ("Dolan"), who was injured during the incident in which Messerole was killed. Dolan suffered two gunshot wounds; one was a shallow wound to the neck and the other was to the right forearm. Additionally, the toxicology report indicates Dolan's blood alcohol level was 0.173%, and that he had ingested cocaine and marijuana.
Three witnesses, who were present when Messerole was shot, gave consistent accounts of the events. First, Dolan, a petty officer in the U.S. Navy, told the court he came to New Orleans about 10 p.m. on September 15th to visit his friend from high school, Messerole. The two men decided to go out to a bar in Fat City where they met Jefferson. Nadine Malhotra ("Malhotra"), Messerole's girlfriend, and Medina stayed at the apartment. Dolan admitted having approximately four drinks ("crown and coke") and a beer or two during the course of the night. Also during the evening, Messerole and Dolan went to Dolan's car where they ingested cocaine. When the men left Fat City, the victim wanted to go to a cigar bar, but Dolan did not want to go. Messerole suggested they go back to his house to get his car, and Dolan drove Messerole and Jefferson to Joseph Street. Dolan turned the radio on as loud as it would go so that he could not hear the voices of Jefferson and Messerole complaining that they did not want to go all the way uptown. When they arrived at the Joseph Street address, Messerole and Jefferson were arguing. They immediately went into the house, and Dolan stayed behind momentarily to lock his car and roll up the windows. When he entered the house, Dolan tried to go into the bathroom, but the door was locked.
As he walked into the living room, Medina was walking out, saying, "Shawn, the gun is out, the gun is out." Dolan saw that Jefferson held a gun in his right hand. Dolan walked between Jefferson and Messerole who were still arguing. Dolan pulled Messerole away from Jefferson, but Messerole pushed Dolan away and shoved Jefferson. Dolan again grabbed Messerole and again was pushed away. Jefferson raised his gun and shot Messerole in the chest. Dolan, trying to shield Messerole, was shot in the arm by a second bullet. Jefferson lunged at Messerole, who had turned away, and shot him in the head. As Dolan fell, he saw that Jefferson was going through Messerole's pockets. Jefferson asked Dolan for his money, and Dolan gave the currency from his pocket to Jefferson. Jefferson then shot Dolan a second time. Dolan passed out briefly, and when he awoke, he called 911 on his cell phone. However, he did not know the address of the apartment, and he handed the telephone over to Medina who gave the operator the information. Dolan noticed the blood on the floor around Messerole and realized he was dead. Dolan left the apartment and walked to the sidewalk where he lost consciousness. In court, Dolan identified the shirt he had been wearing that day and noted the bullet hole, *575 blood, and burn marks on the collar. Dolan stated he never had any physical altercation with Jefferson, but he did see Messerole hit or shove Jefferson once. Prior to the shooting, Dolan heard the two arguing. Under cross-examination, Dolan stated that Messerole had carried a gun about five years ago when "we thought we were in danger." However, Dolan clarified that Messerole was then fourteen or fifteen years old and carried the gun for about a week. Dolan stated on the night of his death, Messerole was not carrying a gun.
In his testimony, Medina admitted he and Messerole had been members of a gang called the Latin Kings about four years ago. Medina also stated that Messerole shoved Jefferson before Jefferson fired at Messerole.
Malhotra, a seventeen-year-old, told the court that Jefferson was Messerole's best friend. In the early morning hours of September 16th, both Jefferson and Messerole came to her room because Jefferson wanted her to drive him home. He frequently asked her for a ride home after he had been out with Messerole, and Malhotra got up intending to drive Jefferson to his home. However, when she walked into the living room where Medina, Messerole, Jefferson, and Dolan were standing, she heard Jefferson and Messerole arguing. She saw Messerole hit Jefferson. Malhotra described the first three shots as being very close together. Then Jefferson walked over to where Messerole had fallen and began to look for his wallet. Dolan lifted up his head and told Jefferson that "he had shot everyone already and to leave us alone." Then Jefferson shot Dolan a second time. Jefferson told Malhotra to get her car keys and purse. She had not put her contact lenses in, but she drove anyway. When he asked her to stop at her bank to get money for him, she told him that the account held no money. Malhotra drove to the I-10 and past all of the Kenner exits. Jefferson told her Medina had had a gun; Malhotra responded that she had not been wearing her contacts and could not see anything. He also told her that after Messerole hit him, he started shooting because he thought everyone was ganging up on him. They stopped at a call box to use the telephone, but it was broken. While they were stopped, Jefferson threw his gun over the bridge. They got off the highway again at the Ponchatoula exit, and Jefferson called the police. Both were taken into custody. Malhotra told the court she had been with Messerole about six years, and that Messerole had known Jefferson for about a year.
Lacy Ann Nash ("Nash") and Traci Parker ("Parker") both testified for the defense. Nash said she had known Jefferson for about six months prior to the shooting. She knew he had a gun, which could shoot only about four bullets because the barrel was bent. He carried the gun continually for protection. Jefferson never indicated that he needed protection from Messerole. Nash confirmed that Jefferson and Messerole were best friends. Parker testified to the same facts as Nash.
Jefferson testified that he had never been in legal trouble before. On the night of September 15th and the morning of the 16th, Jefferson stated he drank only part of one "Crown and Seven." About 10 p.m., Jefferson, Messerole, and Dolan went to several bars in Fat City and then got into the car. Jefferson and Messerole were discussing Dolan's driving ability because he was not driving well. Dolan's reaction was to play the radio at top volume. When they got to Messerole's apartment, he proceeded to pick a fight with Jefferson, using curse words. Messerole had never spoken to him like that, and Jefferson was frightened. Jefferson went to Malhotra's room to ask for a ride home.
*576 He then walked to the front room to wait for Malhotra. Messerole came toward him and started hitting him. Dolan and Medina also hit him. Medina reached under the sofa for a gun or a black object, which he held in his hand. Jefferson called the police from Ponchatoula to tell them that two people had been shot in New Orleans. Jefferson said that he did not intend to kill or hurt Messerole or Dolan. He simply reacted in fright. Jefferson explained that he needed the gun because he carried large amounts of money. Jefferson threw the gun away because he had purchased it on the street.
Dr. George Stumpf, an optometrist who examined Malhotra's contact lens prescription, testified that her uncorrected vision at 20/400 would not meet the minimum standard for driving. Her vision of objects ten feet away would be blurred. Under cross-examination, the doctor admitted he had never seen her as a patient.
Medina was called as a rebuttal witness. Medina stated that he did not have a gun or a black object in his hand when Messerole was shot, nor did he go under the sofa to take anything out. Furthermore, he never saw Jefferson being attacked by Dolan and Messerole. Medina recounted that Messerole and Jefferson enjoyed singing rap songs together. In one, Jefferson bragged about his gun, and that he would "pull it out and use it if he had to." When the State attempted to play a recording of Jefferson singing such a song, the defense objected and the trial court sustained the objection.
DISCUSSION
In a single assignment of error, the defendant, through counsel, argues that his sentence is excessive. The state responds that the issue is precluded because there was no oral motion to reconsider the sentence, and there is no written motion in the record. The defense merely objected to the sentence at the re-sentencing hearing. However, this Court has held that where an oral objection to the sentence was made at the sentencing hearing, the defendant is limited to a review of the bare claim of excessiveness. State v. Miller, XXXX-XXXX (La.App. 4 Cir. 7/25/01), 792 So.2d 104, writ denied, 2001-2420 (La.6/21/02), 818 So.2d 791; State v. Thompson, 98-0988 (La.App. 4 Cir. 1/26/00), 752 So.2d 293, writ denied, XXXX-XXXX (La.11/2/01), 800 So.2d 870.
Article 1, Section 20 of the Louisiana Constitution of 1974 provides that "No law shall subject any person ... to cruel, excessive or unusual punishment." A sentence, although within the statutory limits, is constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless and needless imposition of pain and suffering." State v. Caston, 477 So.2d 868, 871 (La.App. 4 Cir.10/11/85). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Black, 98-0457, p. 7 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 891, writ denied, XXXX-XXXX (La.5/25/01), 792 So.2d 751.
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case. State v. Caston, 477 So.2d at 871. The reviewing court must also keep in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982).
*577 At sentencing, the trial court considered mitigating and aggravating factors in the commission of this crime. The pre-sentencing investigatory report indicated Jefferson had only one prior arrest and that was in 1999 for criminal damage to property. The trial court lauded the defense attorney for a valiant presentation of the self-defense or justifiable homicide theory of the crime, but opined that the jury made a reasonable conclusion in rejecting that theory. However, while it appears that the defendant was not under the influence of alcohol or drugs, he discharged the gun when it was reasonably foreseeable that great bodily harm might result. The trial court noted that the defendant was armed continuously through the time leading up to the crime, and that he fled after the incident. The trial court also commented that the defendant had no right to carry a gun concealed on his person. Under La.C.Cr.P. art. 893.3, a twenty-year sentence without benefits must be imposed because a firearm was used; La. R.S. 14:31, the manslaughter statute, provides for a sentence of between ten to forty years. The trial court considered that the defendant took one life and endangered another. The trial court then imposed a sentence of twenty-five years, without benefits of parole, probation, and suspension of sentence, which is slightly above the mid-range of sentencing for manslaughter. La.C.Cr.P. art. 14:31(B).
The defense maintains that the twenty-year sentence was mandated, but the extra five years is excessive. However, the trial court made a statement supporting the sentence. The trial court found the fact that an eighteen-year-old carried a gun continually was appalling. Obviously, Jefferson's being armed propelled an argument between friends into a tragic incident. The trial court's primary reason for imposing the extra five years was a sense of shock that the apparently sober defendant shot the unarmed and very drunk victim, whom he considered his best friend, as the victim stood unarmed and only a few feet in front of him.
Moreover, the trial court has great discretion in sentencing within statutory limits. State v. Trahan, 425 So.2d 1222, 1226 (La.1983). In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
The trial court articulated in the record its reasoning and we find no abuse of its *578 discretion, therefore we find no merit to defendant's assignment of error.
The next inquiry is whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances. In light of the jurisprudence, we do not find that this sentence is excessive. In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, this Court affirmed a thirty-three year manslaughter sentence for a first offender who drove the car but did not pull the trigger in a drive-by shooting. In State v. Barrois, XXXX-XXXX (La.App. 4 Cir. 1/31/01), 778 So.2d 1273, this Court affirmed the twenty-five year manslaughter sentence of a fifty-year-old defendant with no prior history of violence. In State v. Black, 28,100 (La. App. 2 Cir. 2/28/96), 669 So.2d 667, the Second Circuit affirmed a forty-year sentence for a twenty year old defendant who kidnapped the victim and killed him during a robbery attempt and then pled guilty to a reduced charge of manslaughter. In State v. Cushman, 94-336 (La.App. 3 Cir. 11/2/94), 649 So.2d 639, the Third Circuit affirmed a thirty-year sentence of a twenty-one year old, who pled guilty to manslaughter and had no prior criminal history.
CONCLUSION
Accordingly, for reasons cited above, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The defendant uses his middle name, Jamal, and it is spelled Jamahl on his driver's license and when he signed a police rights form. However, the most frequent spelling is Jamal, and that is used here.