# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-435


**STATE OF LOUISIANA**

**VERSUS**

**SHERRI ANN SEPULVADO**


**********

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 62620
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Marc T. Amy, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**MANSLAUGHTER CONVICTION AND SENTENCE AFFIRMED. AGGRAVATED ARSON CONVICTION AND SENTENCE VACATED. REMANDED FOR NEW TRIAL ON CHARGE OF AGGRAVATED ARSON.**

**Don M. Burkett**
**District Attorney**
**Anna L. Garcie**
**Assistant District Attorney**
**Post Office Box 1557**
**Many, LA   71449**
**(318) 256-6246**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**Post Office Box 2806**
**Monroe, LA   71207**
**(318) 388-4205**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Sherri Ann Sepulvado**

AMY, Judge.

The defendant was charged with first degree murder and aggravated arson. The State later amended the bill to charges of second degree murder and aggravated arson. After a bench trial, the defendant was convicted of manslaughter and aggravated arson. The trial court imposed a fifteen-year sentence on the aggravated arson conviction and thirty-year sentence on the manslaughter conviction. Following a hearing on a motion for new trial, the trial court re-sentenced her to twelve years at hard labor on the arson conviction. The defendant appeals.

**Factual and Procedural Background**

This case involves the death of LaTasha Nigerville, whose body was found in her Zwolle, Louisiana home on September 25, 2006. The record establishes that firefighters responded to a fire at her home on that date and that a firefighter discovered her body while clearing debris from the house.

The State alleged that on the evening of September 24, 2006, Sherri Sepulvado, Chad Rivers and Martrell Lynch were with LaTasha at her residence, as were Jerrick Thomas and Patrick Penegar. The State argued that, at some point during an evening of drug use by the group, Ms. Sepulvado and LaTasha became involved in a physical altercation and that the defendant struck the victim in the head with a small bat. The State argued that LaTasha fell and was not making sounds or moving. It contended that her clothes were removed, a mattress was placed on top of her, and that gasoline was poured onto the mattress and set ablaze. The State contended that the group then left the home.

Sherri (hereinafter "the defendant"), Chad, and Martrell were indicted for first degree murder and aggravated arson in December 2006. The murder charge was later reduced from first degree murder to second degree murder. While Martrell entered

into a plea agreement with the State during the co-defendants' October 2009 bench trial, the case proceeded against the defendant and Chad. The trial court acquitted Chad of second degree murder, but convicted him of aggravated arson. The trial court convicted the defendant of manslaughter and aggravated arson.

In February 2010, the trial court denied the defendant's motions in arrest of judgment and new trial. It then sentenced her to thirty years imprisonment at hard labor for the manslaughter conviction and fifteen years at hard labor without the benefit of parole, probation, or suspension of sentence for the aggravated arson conviction. The trial court denied the defendant's motion to reconsider sentence. The trial court granted the defendant's appeal on March 15, 2010. This appeal was taken from the manslaughter and aggravated arson convictions.

Subsequently, in May 2010, Chad filed a motion for post-verdict judgment of acquittal, arguing that the evidence demonstrated that LaTasha was dead at the time the fire was set. Thus, he argued that he could not have been convicted of aggravated arson, that the evidence only supported a simple arson conviction and that his acquittal of second degree murder indicated that the trial court found that LaTasha was dead at the time of the fire. The trial court granted the motion, and sentenced Chad to twelve years at hard labor.[1]

Subsequently, the defendant filed a "Motion for New Trial," asserting that the granting of the motion for post-verdict judgment of acquittal constituted newly discovered evidence. She referenced Chad's assertion that the evidence indicated that LaTasha died before the fire was set. At the August 26, 2010 hearing on the motion,[2]

_____

[1] Neither Chad Rivers' conviction nor the granting of the post-verdict judgment of acquittal are before the court in this proceeding.

[2] As the order of appeal was previously entered, the trial court heard the motion for new trial upon remand from this court. *See* La.Code Crim.P. art. 853.

2

defense counsel requested the same relief granted to Chad, i.e., the reduction of the aggravated arson conviction to simple arson. The trial court denied the motion. However, the minutes from the hearing provide that the trial court "amended the charge the defendant was convicted of to **Simple Arson** instead of **Aggravated Arson**." The transcript reflects that the trial court sentenced the defendant to twelve years at hard labor, to be served concurrently with the thirty-year sentence.

The defendant appeals, arguing that: 1) the State presented insufficient evidence to sustain the manslaughter and simple arson convictions; 2) the trial court erred in denying her motion for bill of particulars; 3) the State failed to provide timely discovery of evidence; 4) the proceedings violated the protection against double jeopardy; 5) the trial court erred in denying her motion for mistrial upon the prosecutor's reference to her failure to testify; and that 6) the sentences are excessive.

## Discussion

*Errors Patent*

Our review of the record in accordance with La.Code Crim.P. art. 920 reveals no errors patent on the face of the record that require correction.

*Sufficiency of the Evidence*

The defendant first asserts that "[t]he evidence presented by the State against [her] was insufficient to support convictions of manslaughter and arson." We first turn to the latter conviction.

*Simple Arson*

Both the defendant and the State contend that, at the hearing on the motion for new trial filed after the order of appeal was entered, the trial court "reduced" the defendant's aggravated arson conviction and entered a conviction of simple arson.

3

The defendant's appellate brief assumes a conviction of simple arson. However, as referenced in the factual and procedural background, the record only clearly reveals a conviction of aggravated arson. The results of the hearing on the motion for new trial are unclear as to whether the trial court vacated the defendant's conviction for aggravated arson and convicted her of simple arson or whether she was re-sentenced.

Although it denied the motion for new trial, the trial court explained that:

> [O]ut of fairness, out of equity, in my opinion when I heard this case–it was a bench trial–after looking back on the testimony and the relief that I granted Mr. Rivers, the victim in this case, in my opinion, according to the coroner's testimony, was deceased at the time. The coroner did not say those words but that is my interpretation of his testimony, the victim was deceased at that the time that Mr. Rivers burned her body. So I do not think it fits–aggravated arson fits under the Code. I think simple arson is more appropriate. I'm going to sentence Ms. Sepulvado under the simple arson statute and give her twelve years. I'm amending her sentence regarding aggravated arson from fifteen years without benefit to twelve years at hard labor concurrent with the thirty year sentence that she's serving.

This does not indicate that the trial court disturbed the defendant's conviction for aggravated arson. It instead appears that the trial court denied the motion for new trial, but re-sentenced the defendant.[3] The minutes of the hearing, however, indicate the trial court vacated the aggravated arson conviction and entered a conviction for simple arson. The minutes provide that: the trial court "amended the charge the defendant was convicted of to **Simple Arson** instead of **Aggravated Arson**."[4] The

---

[3] Even if the trial court construed the motion for new trial as a motion to amend sentence, La.Code Crim.P. art. 881(A) provides that "[a]lthough the sentence imposed is legal in every respect, the court may amend or change the sentence within the legal limits of its discretion, *prior to the beginning of the execution of the sentence*." (Emphasis added.) Since the record demonstrates that the defendant was serving her sentence, the trial court lacked authority to amend or change the sentence under this provision.

[4] While La.Code Crim.P. art. 821 provides for a motion for post verdict judgment of acquittal, such a motion "must be made and disposed of before sentence." Thus, the trial court could have not construed the motion as such.

defendant argues sufficiency of the evidence with regard to a simple arson conviction. However, we find the record insufficient to address the conviction as such.

It is apparent from the trial court's ruling that, in consideration of a ruling in the co-defendant's case, it felt that further action was warranted. The vehicle before it was a motion for new trial which it denied in name, but granted in effect. However, La.Code Crim.P. art. 857 does not permit the trial court to summarily modify the conviction and/or sentence. Instead, "[t]he effect of granting a new trial is to set aside the verdict or judgment and to permit retrial of the case with as little prejudice to either party as if it had never been tried." *Id.* Finding that the trial court erred in effectively granting the motion for new trial, but not ordering a retrial of the aggravated arson conviction, we set aside the verdict of aggravated arson and remand for a new trial. We turn to reconsideration of the defendant's manslaughter conviction, which was not at issue in the motion for new trial.

Manslaughter

The defendant questions the certainty of the evidence with regard to the cause of death and contends that the testimony of alibi witnesses for her and Chad should have been favored over other witnesses linking her to the events preceding LaTasha's death. The defendant observes that there was no physical evidence of her involvement in the crime(s). She further asserts that the evidence connecting her to the crime involved the testimony of two men, Patrick Penegar and Martrell Lynch, who "by their own testimony, stripped LaTasha's unconscious body with the intent of raping her. It was during this time Latasha died - when she was at the mercy of two men intent on raping her while she was unconscious." She contends that since these individuals entered pleas, they were "not available for the Trial Court to hold

5

responsible." She argues that her conviction followed as she and Chad "were the only options left to the Court."

When sufficiency of the evidence is raised on appeal, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have determined that the State proved the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). As the trial court fulfills the role of the fact finder in weighing the credibility of witnesses, an appellate court should not second guess those credibility determinations beyond the sufficiency evaluations under the *Jackson* standard. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). However, in order to affirm a conviction, the record must indicate that the State satisfied its burden of proving the elements of the crime beyond a reasonable doubt. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

Louisiana Revised Statutes 14:31(A) provides, in pertinent part, that manslaughter is:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

> (2) A homicide committed, without any intent to cause death or great bodily harm.

> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person[.]

6

Testimony established that LaTasha and the defendant were involved in illegal drug use and had an acrimonious relationship, including a physical altercation two weeks before this offense. As for this earlier altercation, Scott Gandy testified that he, Chad, and the defendant drove to LaTasha's house and that the defendant stated that "she was gonna get her, gonna whip her butt." When LaTasha exited the house, she and the defendant began to fight. Gandy testified that the defendant had a little bat[5] in her hand, but that Chad took it from her. Chad's cousin, Shane Rivers, also testified regarding this fight which occurred two weeks before the fire.

With regard to LaTasha's death, three men, Lynch, Penegar, and Jerrick Thomas, testified that they were at LaTasha's home on the evening of September 24, 2006, a Sunday, with the defendant and Chad. Their testimony supports a finding that, during that evening, the defendant and LaTasha again became involved in a altercation, resulting in the defendant striking LaTasha on the back of the head with a small bat. Their testimony also supports a view that the blow rendered LaTasha at least unconscious and that the defendant and Chad pulled a mattress over her body, poured gas from a can or jug, and lit the mattress on fire.

Thomas explained that he had just been released from prison on that evening. He stated that he was with Chad, who had been smoking crack cocaine, and that they traveled to a house where the latter "got a gas can." At some point, the two also stopped at a store for purchases, including several dollars worth of gasoline. According to Thomas, after he and Chad arrived at LaTasha's house, the defendant arrived with Lynch and Penegar. He stated that the group watched a movie and that

_____

[5] Diana Speight testified that she was with the defendant when the defendant found a "child sized wooden bat" which the defendant placed in her boyfriend's vehicle at that time.

7

LaTasha and Chad smoked crack cocaine, whereas the defendant, Lynch, and Penegar smoked "ice," methamphetamine. Thomas explained that LaTasha and the defendant began to fight and that LaTasha fell onto a couch after the defendant hit her "on the back of the head with a club."

Thomas explained that Lynch and Penegar then "rolled" LaTasha onto the floor, removed her clothes, and "got on top of her." He denied that he saw them do "anything" to LaTasha during this time. He stated that LaTasha did not move or talk after she was hit by the defendant. He stated that the defendant was nearby, laughing during this time. Thomas testified that the defendant and Chad pulled a mattress over LaTasha, that Chad poured gas from a red and black gas can over the mattress, and that "Chad and [the defendant] lit a match." The group then left the house.

Penegar also testified that he heard LaTasha and the defendant arguing in the bedroom. He then heard a "thump." Penegar stated that Chad dragged LaTasha into the living room and that Lynch began "messing with her shirt."[6] Penegar explained that the defendant and Chad covered LaTasha's body with a mattress, that Chad started "dosing [sic] the mattress and around the mattress" with gasoline, and Chad and the defendant lit the mattress. He explained that the group ran from the house after the mattress "caught fire." Afterwards, Lynch accompanied the defendant home, where they stayed until the next evening and continued to use drugs. He stated that, once at the defendant's home, she changed her clothes in the laundry room. He also testified that on the next evening, Chad arrived and assaulted the defendant.

---

[6] Although he denied that he or Lynch had sexual intercourse with LaTasha, he admitted he had told the police shortly after the incident that Lynch did have sexual intercourse with her as she lay unconscious. However, he testified that he had lied.

During trial, Lynch, a co-defendant, pled guilty to accessory after the fact and agreed to testify for the prosecution in exchange for use immunity. He testified as to the defendant hitting LaTasha on the head with the "little bat," and the removal of her clothes by himself and Penegar. Lynch stated that he stood over her intending to have sex with her, but then told Penegar that "the little bitch ain't moving, ain't breathing." He also testified that Chad and the defendant placed the mattress over LaTasha, that Chad "put[] gas around the mattress[,]" and that Chad lit the match and threw it on top of the "the bed." Lynch also explained that, the next evening, Chad arrived at the defendant's home, grabbed her, and stated that they needed to talk about "what had happened." Lynch testified that, later, the defendant asked him to "take the charge for her."

In addition to those in the house at the time of the fire, the State presented other witnesses implicating the defendant. Amy Woods testified that, as she and the defendant drove by LaTasha's house a few days before the fire, the defendant told her she was "going to burn that house down with that bitch in it." She explained that the defendant called her on September 24 and told her that she was with Lynch and Penegar at her house. Around midnight, the defendant called and told her that she and Chad had gone to LaTasha's house where she had a fight with the victim. Woods said that, after she heard about the fire, the defendant told her that LaTasha was not in the house when it burned. She explained that, at some point, the defendant told her that she had stabbed LaTasha and that Chad "put a mattress on her and burned her."

Woods also testified that, while speaking with the defendant on the evening after the fire, she heard someone who sounded like Chad yelling and stating that "they had to get their story straight." Woods explained that a few days later, the defendant

9

told her that she was going to Georgia. Woods reported that she went to the police regarding the conversations at that time.

Kelly Thurmon, the defendant's roommate, testified that she found Lynch and Penegar in the defendant's room in the early morning on the day of the fire. She stated that she smelled a strong odor of smoke and that she found the defendant in the adjacent laundry room changing her clothes. She also testified regarding Chad's arrival at the home later in the evening. She stated that he began "strangling" the defendant and that he said: "I ain't getting nailed for this, bitch, uh, I ain't going down for this by myself."

Bradley Craig, identified as the defendant's boyfriend at the time, testified that, as he and the defendant drove by the burned house a few days later, she stated: "I can't believe I did that." He further admitted that he told the police that the defendant confessed to him that she killed the victim. However, he testified that he lied to the police when he told them that she confessed because of threats that the Chief of Police and the fire marshall had made.

As for the victim's cause of death, the State presented Calcasieu Parish Coroner and forensic pathologist Terry Welke, who stated that he performed the victim's autopsy. He determined that she had a bruise on the back of her head and a broken wrist bone. Approximately eight-five percent of her body was burned. While he found no evidence of foul play and returned the body to Sabine Parish, he re-evaluated the body after it was learned there may have been a blow to the back of the head. Dr. Welke stated that the blow that caused the bruising to her head could have rendered her unconscious, but that it was insufficient to have caused her death. He also stated that he did not believe that the drugs found in her system were sufficient

10

to have caused her death. Dr. Welke testified that there was no soot in the victim's lungs and explained this absence was significant since soot below the voice box area makes it "highly likely that the individual was alive at the time of the fire." However, he also stated that a very hot fire could have caused "spasms within the upper airways which would not allow carbon monoxide or soot to go below the voice vocal cords." Dr. Welke further stated that a person in the victim's situation could have suffocated from the mattress, "because if the person is unconscious, they're unable to go and turn their head or whatever the case may be and the mattress, if it's over the face, can obviously obstruct the airways."

An associate professor of pathology at Louisiana State University Health Sciences Center in Shreveport, James Traylor, also testified regarding the cause of death after review of the autopsy report. Given hypothetical facts corresponding with the victim's situation, Dr. Traylor opined that the cause of the death was the "blunt force injury to the head. But. . . .asphyxia does have to be entertained as a cause of death" due to the mattress or possibly strangulation. He further theorized that death could be caused by "either direct thermal injury that could also result in asphyxia in and of itself such as was entertained earlier in a conflagration which one would expect if you had an accelerant on something and you lit it up."

The defendant argues that in order to accept the State's eyewitnesses to the events, "it is necessary to disbelieve the testimony of five other people." She points to Thurmon's statement that the defendant was in her bedroom the night of the fire and into the morning hours, until at least 4:30 a.m. when she explained that she discovered Lynch and Penegar in the defendant's bedroom. Thurmon stated that she "checked" on the defendant about 10:00 p.m., and the defendant was in her room.

11

She said that she again saw the defendant at about 2:00 a.m., and she was asleep in her bed. She also explained that the door to defendant's room made a loud noise when opened or closed, and that she did not hear the door open or close prior to finding Lynch and Penegar in the room at approximately 4:30 a.m. Monday morning.

The defendant also notes that Chad's uncle, mother, and aunt testified that Chad's truck was at his aunt's house throughout the events. His uncle testified that he had disabled the battery in order to prevent Chad from driving the truck a few days before the fire as he felt that Chad was too intoxicated. Further, his mother testified that, on Sunday evening, she went to Chad's house between 9:30 and 10:30 p.m. to talk with him, and he was sleeping.

Certainly, the Rivers family members' testimony regarding the availability of the truck was inconsistent with other evidence insofar as Thomas testified that he and Chad traveled to the scene in Rivers' truck. Further, Lynch testified that he and Penegar went to LaTasha's house with the defendant in Bradley Craig's jeep. However, Bradley Craig, identified as the defendant's boyfriend, denied that the defendant had his jeep because he had taken the jeep away from her following an argument.

The defendant points to other inconsistencies in the accounts of the evening as well, particularly those of Thomas, Lynch, and Penegar. Yet, the testimony consistently reflected that the defendant struck the victim with a small bat-like object, she and Chad covered the victim with a mattress, gasoline was poured, and the defendant and/or Chad lit matches to start the fire. Testimonies also consistently reflected that the group left the house afterwards.

12

Undoubtedly, inconsistencies existed in the witness testimony. However, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writ denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). The finder of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the witnesses' testimonies. On review, a court may impinge on the discretion of the fact finder only to the extent necessary to guarantee the fundamental due process of law. *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002). We do not impinge on that discretion here.

In sum, we find that the evidence supports the manslaughter conviction insofar as manslaughter may be a homicide committed without intent to cause death when the "offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1[.]" La.R.S. 14:31(A)(2)(a). According to testimony, the defendant hit the victim on the head with a bat sufficiently hard to render her unconscious, a second degree battery on the victim.[7] Martrell Lynch also testified that the victim was not breathing prior to the mattress being placed over her body. Furthermore, Dr. Welke testified that there was no soot found below the victim's voice box, which generally indicated that an individual burned in a fire such as the

---

[7] A battery "is the intentional use of force or violence upon the person of another[,]" and a second degree battery "is a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury." La.R.S. 14:33 and 14:34.1. For the purpose of the second degree battery statute, serious bodily injury includes being rendered unconscious. La.R.S. 14:34.1(B).

victim was burned was not breathing at the time the fire consumed her. In light of these factors, the evidence was sufficient to support the defendant's conviction for manslaughter. *See, e.g., State v. Loston*, 03-977 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, *writ denied*, 04-792 (La. 9/24/04), 882 So.2d 1167.

We note that the defendant contends that the verdict is unsupportable without evidence affirmatively establishing the victim's cause of death. However, the verdict could reflect the trier of fact's right to compromise between the verdicts of guilty of second degree murder and not guilty. In *State v. M.L. Jr.*, 09-392, pp. 5-6 (La.App. 3 Cir. 4/14/10), 35 So.3d 1183, 1187-88, quoting *State v. Charles*, 00-1611, pp. 4-5 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519-20, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420, this court explained:

> Defendant offered no evidence sufficient to support the mitigating circumstances of sudden passion or heat of blood. Thus, there was insufficient evidence for the jury to return the responsive verdict of attempted manslaughter. However, the verdict of attempted manslaughter may have reflected the jury's right to compromise between the verdicts of guilty of attempted second degree murder and not guilty. In *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), the court held that compromise verdicts are permissible, so long as the evidence supports either the verdict given or the original charge.
>
> There was sufficient evidence for the trier of fact to have found that the State proved beyond a reasonable doubt all the elements necessary to support the charge of attempted second degree murder; therefore, a responsive verdict of attempted manslaughter was proper.

We conclude that the State's evidence supported a verdict of second degree murder, insofar as the defendant hit the victim on the head with a small wooden bat. Second degree murder is defined as a killing when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(A)(1). There was testimony that the victim was not breathing prior to the defendant and Chad pulling the mattress

14

over her body. There was also testimony that the defendant attempted to use the bat on the victim a few weeks prior to the fire and had made threatening statements regarding the victim. Viewed in a light most favorable to the prosecution, we find that the evidence could indicate that the defendant intended to inflict great bodily harm when she hit the victim on the head with the small wooden bat. Accordingly, the evidence was sufficient to support a conviction of the charged offense.

This assignment of error lacks merit.

*Bill of Particulars*

The defendant filed a motion for bill of particulars asking the trial court to order the State to advise her as to which subsection of the second degree murder statute she was being charged with, La.R.S. 14:30.1(A)(1), specific intent to kill or to inflict great bodily harm, La.R.S. 14:30.1(A)(2), felony murder. A hearing was held on several motions, including the motion for bill of particulars. The defendant argued the State had to elect which subsection of the statute they intended to proceed under in order for her to prepare her defense. She further contended that prosecution under the felony murder theory and aggravated arson would constitute a double jeopardy violation. The trial court ordered the State to reply to the defendant's motion for a bill of particulars within seven days of the hearing. The State subsequently filed a "State's Answer to Motions for Bills of Particular" in September 2009. Afterwards, the trial court denied the defendants' motions. In brief, the defendant questions the denial of her motion, asserting that the open file discovery available to her was not enough to "answer the crucial questions" of the State's theory. She contends that this prejudiced her defense.

15

In *State v. Winston*, 97-1183, pp. 9-10 (La.App. 3 Cir. 12/9/98), 723 So.2d 506, 511, *writ denied*, 99-205 (La. 5/28/99), 743 So.2d 659, this court stated:

> The purpose of a bill of particulars is to provide an accused with sufficient information as to the nature and cause of the offense with which he is charged. *State v. Wiggins*, 518 So.2d 543 (La.App. 5 Cir.1987); *writs denied*, 530 So.2d 562 (La.1988) and 569 So.2d 979 (La.1990); *State v. Frith*, 436 So.2d 623 (La.App. 3 Cir.), *writ denied*, 440 So.2d 731 (La.1983); La.Code Crim.P. art. 484. It is now clear that the constitutional provision, La. Const. art. 1, § 13, requiring that a defendant be informed of the nature and cause of the accusation is not to be restricted to mean that he must be so informed by indictment; the defendant may also be informed of the facts by bill of particulars. *State v. Griffin*, 495 So.2d 1306 (La.1986); *see also State v. Gainey*, 376 So.2d 1240 (La.1979).

> A defendant is entitled to know the alleged method of the commission of an offense when several means of commission of an offense are specified by the statute. *State v. Huizar*, 414 So.2d 741 (La.1982). However, a motion for a bill of particulars is not a method for a defendant to obtain the state's evidence. La.Code Crim.P. art. 484; *State v. Gray*, 351 So.2d 448 (La.1977). It is a tool for a defendant to become informed about the nature and cause of the charge against him. La.Code Crim.P. art. 484; *State v. Huizar*, 332 So.2d 449 (La.1976). The bill of particulars may not be used to discover the details of the evidence, that is, to know "exactly how," the state intends to prove its case. *State v. Walker*, 344 So.2d 990 (La.1977). There is no formula regarding the information the State must make available. The extent to which particulars are granted depends on the nature and complexity of the case. *State v. Miller*, 319 So.2d 339 (La.1975). Reversible error occurs when there is a failure to provide a defendant information "of the nature and cause of the accusation against [him]." *State v. Atkins*, 360 So.2d 1341, 1344 (La.1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

In *Winston,* the defendant was charged with felony theft of cash valued more than five hundred dollars. The state had given defendant open file discovery access. However, he asserted that the state failed to provide him with a bill of particulars as to the nature and cause of the charge. This court noted that the record indicated he was given copies of all police reports, arrest warrants, the statements of the witnesses,

16

and copies of the checks and deposit slips. This court affirmed the conviction, noting that the information provided apprised him of the nature and cause of the accusation.

In brief, the defendant cites *State v. Johnson*, 365 So.2d 1267 (La.1978), to support her position that she was entitled to a response to her motion for bill of particulars. In *Johnson*, the defendant was charged with attempted armed robbery and attempted second degree murder. The defendant filed a motion for bill of particulars, requesting that the state specify which of the statutory methods of committing the crime was charged, so that he could prepare his defense. The state responded only that it was not required to specify the subsection under which it was prosecuting the defendant. The trial court ruled this answer was sufficient. Although the supreme court did not agree with the trial court, it affirmed the convictions and stated:

> The use of a short-form indictment, as in this case, contemplates that the accused may procure details as to the alleged statutory method(s) by which he committed the crime charged through a bill of particulars. Official Revision Comment (b), La.C.Cr.P. art. 465 (authorizing short-form indictments). *See also State v. Mason*, 305 So.2d 523 (1974) and *State v. Clark*, 288 So.2d 612, 615-16 (1974) and jurisprudence therein summarized.

> Nevertheless, as in *Mason*, we are not prepared to hold that reversible failure resulted from the state's rather obstinate refusal to specify that, under the obvious facts and other admissions of the particulars, it was proceeding under both subsections. (Further, the state's answer might possibly be so construed.) Taken as a whole, the short-form indictments adequately informed the accused of the nature and cause of the prosecution, and the factual basis upon which it was founded, insofar as constitutionally and statutorily required in order to afford the accused a fair opportunity to defend against the charges brought against them.

*Id.* at 1270-71 (footnote omitted). The supreme court further noted that the state was not required to reveal which subsection was used to commit the crime or to choose between the two subsections if the subsections were equally applicable under the facts of the case. *Id.* at 1271, n. 1.

17

In this case, the State filed a "State's Notice to Proceed Under Alternative Theories of Second-Degree Murder," indicating it would proceed under the theory of specific intent murder and a murder perpetrated during an aggravated arson. We find that the trial court did not err in denying the defendant's motion for a bill of particulars which required that the State elect a subsection of second degree murder it was prepared to prove. The State had granted the defendant open file discovery, providing the defendant with access to police reports and witness statements. Further, other than stating that the information was needed to develop her defense, she does not indicate how she was prejudiced by the failure to designate one subsection over the other, particularly considering that her defense was that she was not present at the time of the fire. Finally, because what actually caused the victim's death was undetermined prior to trial, the facts of the case were applicable to both subsections. Here, it seems that the defendant knew as much of the basis of the charge as did the State in this case. *See also State v. Gardner*, 02-1506 (La.App. 3 Cir. 4/30/03), 844 So.2d 1097, *writ denied*, 03-1490 (La. 10/3/03), 855 So.2d 310.

This assignment of error lacks merit.

*Timeliness of Discovery*

The defendant argues that her case was prejudiced because the State failed to timely supply her with discovery materials. On the morning trial commenced, the defense attorneys joined in a motion *in limine* requesting a continuance of the trial or in the alternative to exclude evidence which they asserted was not timely provided by the State. At that time, the attorneys explained that shortly before trial, they began to receive the names of various witnesses that the State intended to call and statements made by some of the witnesses. The attorneys asserted that they had no

18

time to investigate the witnesses, specifically as to any past criminal history or regarding their statements. The State responded that as they prepared for trial other witnesses and facts were revealed. Some of this information was developed after the defendants issued their trial subpoenas. The State argued that they passed the information along to the defense as soon as they learned of it.

The trial court denied the motion to continue and the motion *in limine* to exclude evidence, but ordered the State to disclose the substance of the new witnesses' anticipated testimonies and make them available to defense counsels. The trial court also delayed the trial one day to allow the defense attorneys to interview the witnesses and prepare for cross-examination.

The trial court has discretion in granting a continuance. La.Code Crim.P. art. 712. "The denial of a motion for continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice." *State v. Bartley*, 03-1382, p. 5 (La.App. 5 Cir. 3/30/04), 871 So.2d 563, 567, *writ denied*, 04-1055 (La.10/1/04), 883 So.2d 1006.

In *State v. Pitre*, 04-545, pp. 14-15 (La.App. 1 Cir. 12/17/04), 901 So.2d 428, 439, *writ denied*, 05-397 (La. 5/13/05), 902 So.2d 1018, the first circuit explained:

> The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony, to permit the defense to meet the State's case, and to allow proper assessment of the strength of its evidence in preparing a defense. However, the failure of the State to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. *State v. Sanders*, 93-0001, p. 9 (La.11/30/94), 648 So.2d 1272, 1281, *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); *State v. Schrader*, 518 So.2d 1024, 1032 (La.1988). When the defendant is lulled into misapprehension of the strength of the State's case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which constitutes reversible error. *State v. Mitchell*, 412 So.2d 1042, 1044 (La.1982). Louisiana Code of Criminal Procedure article 729.5

19

details the arsenal of sanctions available for discovery violations. Even where a violation is clear, no particular remedy is mandated.

The defense in this case had access to the State's files through open file discovery. However, the record shows that, on October 20 through 23, 2009, the State notified the defendants of several witnesses, including the witnesses' criminal histories, a polygraph interview with the defendant, including the polygrapher's notes, an inculpatory statement allegedly made by Martrell Lynch regarding whether he had sexual intercourse with the unconscious victim, and inculpatory statements allegedly made by Chad to Dennis Blackerby, plus four pages of Blackerby's criminal history. The defendants were also notified of the statements Chad made to Chief of Police Marvin Frazier regarding gas cans left at the home of Jimmy Ray Malmay. Finally, on October 23, 2009, the State sent the defense notice of a plea agreement with Jerrick Thomas, who had also been charged with second degree murder of the victim and who agreed to testify for the State in exchange for a recommended sentence of three years. Trial commenced on October 26, 2009, but was delayed one day as stated above.

The only listed witness the defendant complains of in brief is Opal Parrie, whose criminal history included a warrant for a first degree "something." At the hearing, defense counsel argued that the "something" had to be investigated and that while "the D.A.'s office has indicated they have open filed discovery, they haven't given me Opal Parrie Cheatwood's file so I don't know that." Parrie's testimony at trial was not probative for either the State's or the defendants' cases and defense counsels did not examine her regarding any convictions she may have had. The defendant argues that the State had the polygraph notes in its possession since 2006, but waited until a week before trial to disclose them to the defense. The State advised

the trial court that the defendants had been given the pretest polygraph interview and the polygrapher's summary months before. The additional notes sent to them were taken by federal agents, and the State had only secured the notes just prior to sending the notes to defendants.

As for the statement made by Martrell Lynch, the State explained that after it received a copy of a subpoena issued from the defense, they saw that the person to whom the statement was made was on the list. The State thereafter arranged an interview with him and the witness said that Lynch told him that he had had sexual intercourse with the victim, but they would not find his DNA because he had worn a condom. During this interview, the State learned of another person who supposedly heard Chad confess he was responsible for the victim's death. The State asserted that all this information was sent to defense counsel immediately.

In *Pitre*, 901 So.2d 428, the defendant argued the trial court erred when it did not grant his motion to exclude testimony of a witness who was called to testify for the state. Pitre argued the state's notice of intent to use her testimony on the second day of trial was untimely and therefore constituted an ambush. When the witness appeared the morning of trial, the state interviewed her and she revealed an inculpatory statement made to her by the defendant. The first circuit stated:

> In this case, defense counsel argues that he did not have a fair opportunity to prepare for cross-examination or to locate other witnesses who might have overheard the alleged incriminatory statement and impeached Ms. Rogers' testimony. He further complained at trial that he would not be able to question the detective who took her initial statement before cross-examination of Pamela Rogers. Finally, he argued that he would not have time to file a motion to suppress her testimony or to investigate whether she might have an ulterior motive for testifying against the defendant. He asked the trial judge to exclude her testimony or delay her taking the stand until the next day.

21

After a thorough review of the record, we are not persuaded that the failure of the trial judge to grant defendant's alternative requests justifies a reversal of the defendant's conviction under the particular circumstances presented here. In our view, the State complied with both the letter and the spirit of the law. Full good-faith pre-trial discovery was provided prior to trial. The State was obviously aware it had a continuing duty to supplement discovery and, as soon as the prosecution learned of Rogers' new information, it notified defendant prior to the State's opening statement. In our view, the trial judge did not err in refusing to exclude this testimony.

Moreover, although he did not exclude the highly relevant testimony, the trial judge went to great lengths to avoid any undue prejudice to the defendant. He assured defense counsel that he could fully cross-examine the witness and that he would allow him to subpoena any other person he learned of during cross-examination who overheard the conversation in dispute. In addition, he indicated that defense counsel would have the right to recall Ms. Rogers if he chose to do so. Thus, defense counsel effectively had the one day of extra time to investigate that he requested and could have recalled the witness. We cannot conclude that the timing of the notice in this case, considering the nature of the evidence at issue, resulted in the proceedings being fundamentally unfair. *See State v. Allnet*, 419 So.2d 472, 475 (La.1982); *State v. Hebert*, 443 So.2d 613, 615-616 (La.App. 3d Cir.1983), *writ denied*, 444 So.2d 1215 (La.1984).

*Id.* at 439.

We do not find that the trial court's refusal to exclude the evidence or to grant a continuance warrants a reversal of the conviction. Unlike *Pitre*, where the allegedly prejudicial evidence was not given to the defendant until the second day of trial, the State in the current case distributed the obtained information as they received it prior to the trial. Also, the trial court ordered the State to reveal the substance of the anticipated testimonies and delayed the trial by one day to allow the defendants an opportunity to interview the witnesses. Finally, the defendant has not shown how she was prejudiced by the allegedly late disclosures.

This assignment lacks merit.

22

*Double Jeopardy*

The defendant argues that she was subjected to double jeopardy when she was convicted "of felony manslaughter and the underlying felony of aggravated arson." She asserts that the trial court's finding her guilty of aggravated arson indicated it had agreed with the State's statement made during closing argument, as follows:

> We believe the evidence is there to support a finding of second degree murder with specific intent. If the Court finds that this was aggravated arson, if the Court believes that she was not dead when they placed that mattress on top of her and started that fire, that would be aggravated arson where human life is in danger. And because she died it would fit under the felony murder doctrine.

The State, in brief, asserts that the defendant was convicted of manslaughter and simple arson.

The parties' inability to identify the defendant's arson conviction as either aggravated arson or simple arson for discussion of this assignment confirms the confusion regarding the defendant's conviction. As we above concluded that the trial court effectively granted the defendant's motion for a new trial and have remanded for a new trial on this charge, this assignment is rendered moot.

*Motion for Mistrial*

The defendant argues the trial court erred when it did not grant her motion for a mistrial made after the State allegedly stated during closing argument that "it's been unrefuted, that the only person who showed violent tenancies toward the victim, in this case, was Sherri Sepulvado." The defendant argues that this statement was an indirect reference to the fact that the defendant did not testify at trial, because she was the only one who could have "refute[d]" the statement.

The defendant cites La.Code Crim.P. art. 770(3) in support of her argument. Article 770 provides:

23

Upon a motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

. . . .

(3) The failure of the defendant to testify in his own defense[.]

However, in addition to the explicit wording of Article 770, the Supreme Court of Louisiana has stated that Article 770 is designed to guard against improprieties *in the presence of a jury*. *State v. Marshall*, 359 So.2d 78 (La.1978). *See also State v. Mahogany*, 07-360 (La.App. 5 Cir. 10/30/07), 970 So.2d 1150; *State v. Anderson*, 02-273 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, *writ denied*, 02-2519 (La. 6/27/03), 847 So.2d 1254.

Not only was this matter heard as a bench trial, but the closing argument reference, if any, to the absence of the defendant's testimony was limited and one that the trial court was capable of disregarding. Accordingly, we find no abuse of the trial court's discretion in denying the defendant's motion for a mistrial based on the State's comment made during closing argument. This assignment of error lacks merit.

*Excessiveness of the Sentence*

The defendant contends that the sentences imposed are excessive. In particular she asserts that the thirty-year sentence for manslaughter is grossly out of proportion to the severity of the offenses in light of her assertion that there was no determination as to who caused the victim's death and in light of her young age.

In reviewing an excessive sentence claim, this court has stated:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to

24

acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling,* 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331. Further, this court reviews several factors in consideration of whether a sentence is excessive, including the nature of the crime, the nature and background of the offender, and sentences imposed on similarly-situated offenders in this and other jurisdictions. *State v. Griffin*, 06-543 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, *writ denied*, 07-02 (La. 9/14/07), 963 So.2d 995. Also, the record must indicate that the trial court considered both the aggravating and mitigating circumstances in fashioning the sentence. *State v. Morrison*, 99-1342 (La.App. 3 Cir. 3/1/00), 758 So.2d 283.

In imposing sentence, the trial court, stated:

> Ms. Sepulvado, you appeared in this court. You were tried before me. You waived the jury trial. I found you guilty of manslaughter and aggravated arson. I ordered a pre-sentence investigation to be conducted. The report has been returned to me. It's been made available to your attorney Mr. Owen who has reviewed it. I've noted that you wish to address the Court. You don't have to but you may before I sentence you. I've noted your criminal history. I've noted your social history. I'm going to cause a copy of this to be filed in the record. I've also noted the aggravating and mitigating circumstances in this case.

Manslaughter

Louisiana Revised Statutes 14:31(B) provides that "[w]hoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." Here, the defendant's thirty-year sentence is ten years less than the statutory maximum.

The record reveals no abuse of discretion in the fashioning of this sentence. Instead, the trial court noted that it considered the pre-sentence investigation report and that it considered the aggravating and mitigating circumstances. The defendant asserts that her relatively young age – twenty-six at the time of the PSI report – required a lesser sentence. However, despite her age, the report revealed a conviction for attempted distribution of a schedule II drug in January 2008, which resulted in a two-year sentence. While she was paroled in November 2008, she could not be released due to the present charge. Instead, the sentence expired while she was incarcerated on the offenses under review. The trial court was aware of this drug-related criminal history when it considered the present matter, which also involved drug use.

While the defendant contends that the cause of death was not established at trial, the evidence supports the alternative views that the defendant caused the victim's death by rendering her unconscious and leaving her to burn to death or that she died from a blow to the head during their altercation. Either scenario supports the sentence imposed. Testimony also indicated that the defendant threatened to burn the victim's house with her in it and that the victim was raped or was about to be raped by two men while the defendant stood by and laughed. These gruesome circumstances of the case further support the sentence imposed.

Finally, Louisiana jurisprudence reveals that mid-to-high range sentences have been upheld in other manslaughter cases. *See State v. Cushman*, 94-336 (La.App. 3 Cir. 11/2/94), 649 So.2d 639, *writ denied*, 95-2045 (La. 3/7/97), 689 So.2d 1370. *See also State v. Jefferson*, 02-1159 (La.App. 4 Cir. 12/4/02), 834 So.2d 572. *See also State v. Pegues*, 09-1089 (La.App. 3 Cir. 6/9/10), 43 So.3d 1008.

For these reasons, we do not find that the defendant's thirty-year sentence for manslaughter is excessive. This assignment lacks merit.

Aggravated arson/ simple arson

Discussion of the sentence imposed for this offense is rendered moot by the previous determination to remand for a new trial on the arson charge.

**DECREE**

The defendant's conviction and sentence for manslaughter are affirmed. However, as the trial court effectively granted the defendant's Motion for a New Trial, the conviction for aggravated arson is vacated, and the matter remanded for a retrial on this charge alone.

**MANSLAUGHTER CONVICTION AND SENTENCE AFFIRMED. AGGRAVATED ARSON CONVICTION AND SENTENCE VACATED. REMANDED FOR NEW TRIAL ON CHARGE OF AGGRAVATED ARSON.**